[No. S050290. Dec. 16, 1996.]

WILLIAM P. ROMANO, Plaintiff and Appellant, v.
ROCKWELL INTERNATIONAL, INC., Defendant and Respondent.

## COUNSEL

Shaw & Weitz, John R. Shaw and Mark S. Weitz for Plaintiff and Appellant

Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Michael A. Hood, Eric C. Sohlgren, Paul W. Cane, Jr., Glenn L. Briggs, Robert P. Bryant and Brent R. Bohn for Defendant and Respondent.

## OPINION

**GEORGE, C. J.**—In this case we consider when the statute of limitations begins to run in a wrongful termination case in which the plaintiff has

alleged causes of action sounding in contract and tort, as well as violations of the California Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.; FEHA.) The Court of Appeal concluded that the statute of limitations begins to run on all the alleged causes of action on the date employment actually is terminated, but defendant asserts, primarily on the basis of related federal authority, that the statute of limitations should run from the date the employee is informed unequivocally that his or her employment will be terminated. For the reasons explained below, we conclude that the Court of Appeal was correct, and that its judgment should be affirmed.

## I

Plaintiff William P. Romano was employed by defendant Rockwell International, Inc. (Rockwell) for 29 years. His last position with the company was as the director of human resources of Rockwell's digital communications division. He generally received excellent performance reviews. He was aware beginning in 1987, however, that he had displeased Gilbert Amelio, president of Rockwell's communications systems division, in his handling of a personnel matter that occurred in the company's London office. (The latter division apparently governed the operations of the digital communications division.)

On December 6, 1988, Rockwell's communications systems vice-president, Gary Collins, Romano's immediate superior, informed Romano that Amelio, who was Collins's superior, desired that Romano's employment be terminated. Collins explained that Amelio insisted that Romano accept a one-year teaching fellowship, followed by retirement. Collins proposed that under the circumstances, Romano agree to pursue a teaching fellowship until he reached 85 service points under the company retirement plan and thereupon became eligible for early retirement, and that he then retire. Collins asked Romano to contact him as soon as possible. When Romano suggested he needed legal counsel, Collins advised him not to be hasty, and to think about the proposal and give him a response as soon as possible. Romano understood in December 1988 that Rockwell intended to terminate his employment when he reached 85 points, which would occur May 31, 1991, and that the company was offering no option other than immediate termination. If he retired immediately, he would lose half the pension benefits he otherwise would receive in the event he achieved 85 service points under the company retirement plan.

Romano contacted Collins in January 1989 to work out details of the plan. A written plan for a teaching fellowship followed by retirement at 85 service points was developed, although it appears Romano never signed it. At

various points Romano complained that he did not want to retire and was being ruined, and made some efforts to secure a reversal of the termination decision, to no avail. Romano previously had been successful in fighting off a demotion, and had some hope he could outlast Amelio and survive as a company employee.

Romano's replacement was not hired until December 5, 1989. In the meantime, Romano continued to serve at his post. Romano was 57 years of age, and his replacement 43. After the replacement arrived, Romano served at another post within the company until June 1, 1990, when the planned teaching fellowship began. Romano signed the necessary forms and retired from Rockwell on May 31, 1991. From December 6, 1988, until his retirement in 1991, Romano continued to receive his full salary, in addition to a sum intended to reflect bonus pay for which he was no longer eligible.

On September 18, 1991, Romano filed a complaint with the Department of Fair Employment and Housing, alleging retaliatory termination and age discrimination. On September 21, 1991, the Department of Fair Employment and Housing issued a notice of case closure in the matter, recognizing Romano's right to bring a civil action. On December 9, 1991, Romano filed a complaint in superior court, naming Rockwell and Gilbert Amelio, as well as various unnamed persons, as defendants. The complaint alleged (1) wrongful termination in violation of public policy, (2) retaliatory termination in violation of Government Code section 12940, subdivision (f), (3) age discrimination in violation of Government Code section 12941, (4) breach of implied contract, (5) breach of the implied covenant of good faith and fair dealing, and (6) intentional interference with contractual relations. (The last cause of action was alleged against defendant Amelio alone. Amelio was not a party to this appeal, nor was the sixth cause of action the subject of Rockwell's motion to dismiss on statute of limitations grounds. Accordingly, we do not consider whether this cause of action was time-barred.)

Romano alleged that his employment was terminated because he had complained about and opposed Amelio's unethical and illegal personnel practices (including nepotism and employment terminations in violation of state law and company policy), and also because of his age. He alleged additionally the existence of an implied contract not to terminate his employment absent good cause, asserting that good cause did not exist for the termination.

Defendant Rockwell sought summary judgment on the ground that all the claims alleged against it were time-barred under the applicable statutes of limitations. It asserted the following limitations periods applied. As to the

first cause of action for termination in violation of public policy, it asserted the one-year limitation period set out in Code of Civil Procedure section 340 applied. As to the second and third causes of action, involving claims arising under the FEHA, Rockwell claimed Romano had failed to file a complaint with the Fair Employment and Housing Department within one year, as required by Government Code section 12960. As to the fourth and fifth causes of action, involving claims of breach of implied contract and breach of the covenant of good faith and fair dealing, Rockwell asserted that the two-year limitation period of Code of Civil Procedure section 339 applied. Although plaintiff did not dispute that each limitations period applied, the parties disagreed as to when the statutes of limitations began to run. Rockwell argued they began to run on December 6, 1988, when it notified Romano his employment would be terminated. Romano maintained, in contrast, that the statutes of limitations began to run on May 31, 1991, when his employment actually terminated.

The trial court granted defendant's motion for summary judgment on the ground that all claims were barred by the statutes of limitations invoked by Rockwell. At the hearing on the motion, the court declared that the applicable limitations periods began to run "at the time that the employer said, 'we're going to fire you.'"

The Court of Appeal reversed, concluding that the limitations period applicable to wrongful termination claims begins to run upon actual termination, rather than when the employee is informed unequivocally that discharge is inevitable. The Court of Appeal observed that to require the employee to file a lawsuit while he or she still is employed would destroy any possibility that the employer might rescind the termination decision. It added that to hold the statute of limitations runs from the time of notification of termination would allow employers to create a situation in which employees would be likely to sleep on their claims, and ultimately lose them under the statute of limitations. Finally, the Court of Appeal pointed out that its decision would provide clarity and predictability to litigants, because the date of actual termination rarely would be subject to dispute.

II

A.

Summary judgment is granted only when the papers presented in support of the moving party establish that no issue of material fact exists to be tried and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Mann* v. *Cracchiolo* (1985) 38 Cal.3d

18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]; *Villa* v. *McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) On appeal, the reviewing court exercises its independent judgment, deciding whether the moving party established undisputed facts that negate the opposing party's claim or state a complete defense. (*Jambazian* v. *Borden* (1994) 25 Cal.App.4th 836, 844 [30 Cal.Rptr.2d 768]; *Torres* v. *Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52]; see also *Spann* v. *Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 649 [40 Cal.Rptr.2d 360]; Code Civ. Proc., § 437c, subd. (n).)

■ The applicable statute of limitations does not begin to run until the cause of action accrues, that is, " 'until the party owning it is entitled to begin and prosecute an action thereon.' " (*Spear* v. *California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821].) The Code of Civil Procedure makes this explicit: "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute." (Code Civ. Proc., § 312.)

We must determine when each of plaintiff's causes of action accrued for the purposes of the applicable statutes of limitations. Both parties ask us to decide this issue as a matter of law. It is undisputed that if plaintiff's causes of action accrued on May 31, 1991, at the time of actual termination, his claims were timely filed. If, however, they accrued on December 6, 1988, when Rockwell notified him unequivocally that his employment would terminate when he reached 85 points under the retirement plan, his causes of action were not filed within the applicable limitations periods unless certain exceptions or tolling provisions apply.

■ As we declared in *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923]: "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper."

Rockwell asserts it established by undisputed evidence that the applicable statute of limitations had expired as to each claim before Romano filed his complaint. It makes this assertion on the basis of what it characterizes as undisputed evidence that plaintiff knew as of December 6, 1988, that Rockwell had determined that his employment would terminate as of June, 1991. Romano counters that the evidence was not undisputed. He points to his declaration that he did not intend to retire and hoped he would survive Amelio's efforts to terminate him, and that he had survived similar reversals during his career with Rockwell.

These conflicting assertions by the parties do not preclude our deciding the question whether Romano's causes of action accrued and the limitations periods began to run at the time he was notified that his employment would be terminated, or instead the causes of action accrued and the limitations periods began to run at the time Romano's employment actually was terminated. As we shall demonstrate, even if we were to accept Rockwell's assertion that in December 1988 it notified Romano unequivocally that his employment would terminate in June 1991, it does not follow that his claim necessarily accrued in December 1988.

In considering the question when plaintiff's contract, statutory, and tort causes of action accrued, we take note of the policy underlying the applicable statutes of limitation. ■ Civil statutes of limitations protect defendants from the necessity of defending stale claims and require plaintiffs to pursue their claims diligently. (*Jolly* v. *Eli Lilly & Co.*, *supra*, 44 Cal.3d at pp. 1111-1112; *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807].) They are " 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' " (*Adams* v. *Paul* (1995) 11 Cal.4th 583, 592 [46 Cal.Rptr.2d 594, 904 P.2d 1205], quoting *Telegraphers* v. *Ry. Express Agency* (1944) 321 U.S. 342, 348-349 [88 L.Ed. 788792-793, 64 S.Ct. 582].)

### B.

We turn first to plaintiff's causes of action for breach of contract. As noted, plaintiff contends that Rockwell's termination of his employment on May 31, 1991, violated the terms of an implied contract not to terminate his employment without good cause and breached the implied covenant of good faith and fair dealing implicit in the parties' employment contract.

■ A cause of action for breach of contract does not accrue before the time of breach. (*Spear* v. *California State Auto. Assn.*, *supra*, 2 Cal.4th at p. 1042; *Trustees of Capital Wholesale Electric etc. Fund* v. *Shearson Lehman Brothers, Inc.* (1990) 221 Cal.App.3d 617, 627 fn. 4 [270 Cal.Rptr. 566],; *Niles* v. *Louis H. Rapoport & Sons* (1942) 53 Cal.App.2d 644, 651 [128 P.2d 50]; see also 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 375, p. 402.) We have established that: "There can be no *actual* breach of a contract until the time specified therein for performance has arrived." (*Taylor* v. *Johnston*

(1975) 15 Cal.3d 130, 137 [123 Cal.Rptr. 641, 539 P.2d 425], italics in original.) Nonetheless, if a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred. (*Ibid.*; *Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 29 [142 P.2d 22]; see *Story* v. *San Rafael Military Academy* (1960) 179 Cal.App.2d 416, 417 [3 Cal.Rptr. 847] [applying the doctrine in the context of an employment contract]; see also Civ. Code, § 1440 [in the case of an anticipatory repudiation, the plaintiff may enforce the obligation without previously performing].) The rationale for this rule is that the promisor has engaged not only to perform under the contract, but also not to repudiate his or her promise. (4 Corbin, Contracts (1951 ed.) § 959, p. 852.)

In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies—he or she may "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time." (*Taylor* v. *Johnston supra*, 15 Cal.3d at p. 137; see also 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 806, p. 727.) Most significantly with reference to the case presently before us, in the event the plaintiff disregards the repudiation, the statute of limitations does not begin to run until the time set by the contract for performance. (*Brewer* v. *Simpson* (1960) 53 Cal.2d 567, 593 [2 Cal.Rptr. 609, 349 P.2d 289]; *Trypucko* v. *Clark* (1983) 142 Cal.App.3d Supp. 1, 7 [191 Cal.Rptr. 165]; 3 Witkin, Cal. Procedure, *supra*, Actions, § 378, p. 406.) As Professor Corbin has explained: "For the purpose of determining when the period of limitation begins to run, the defendant's non-performance at the day specified may be regarded as a breach of duty as well as the anticipatory repudiation. The plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitation is held to begin to run against him immediately." (4 Corbin, Contracts, *supra*, § 989, p. 967.)

█ Indeed, whether the breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 800-801, pp. 723-724.) In the context of successive breaches of a continuing contractual obligation, we have explained: " 'In such a contract, where the parties did not mutually

abandon or rescind it upon a breach or successive breaches, the injured party could wait until the time arrived for a complete performance by the other party and then bring an action for damages for such breaches. [Citation.] Respondent was not bound to treat the contract as abandoned on the first breach of it, or on any particular breach, but had his election to still rely on it, and the statute of limitations could not begin to run until it had made its election.' " (*Lambert* v. *Commonwealth Land Title Ins. Co.* (1991) 53 Cal.3d 1072, 1078 [282 Cal.Rptr. 445, 811 P.2d 737]; see also *Trypucko* v. *Clark, supra,* 142 Cal.App.3d at p. Supp. 7.)

■ With respect to Romano's claim that the termination of his employment constituted a breach of an alleged implied contract not to terminate employment without good cause, and of the implied covenant of good faith and fair dealing, it appears that the breach of this implied contract and covenant occurred at the time of termination. Under the facts alleged, Rockwell obligated itself not to *terminate* employment in the future without good cause, and a cause of action for breach accrued at the time of termination.

Alternatively, to the extent the notification of termination was an announcement of the employer's intent not to abide in the future by its contractual obligations, this notification constituted an anticipatory repudiation, providing plaintiff the election of remedies described above and tolling the running of the statute of limitations. Indeed, the implied contract not to terminate without good cause, if established, would constitute an ongoing obligation, and the plaintiff would have the right to elect whether to rely on the contract despite an initial breach—even assuming the announcement of termination were regarded as constituting a present breach. Again, this circumstance would toll the running of the statute of limitations until termination, because Romano continued to perform and accept compensation until the time of actual termination, reflecting an election to treat the contract as still in effect.

Contrary to Rockwell's contention, the Court of Appeal's decision in *Marketing West, Inc.* v. *Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603 [7 Cal.Rptr.2d 859] (*Marketing West*) does not support a contrary conclusion. In that case, independent sales representatives of the defendant's home appliance division alleged they had been employed under an oral sales agreement that defendant agreed could be terminated only for good cause. The sales representatives alleged that in November 1987 they were informed they would have to sign new agreements "for the purpose of uniformity," and were assured the new agreement would have no effect on their relationship with defendant. They signed the new agreements, which provided for

termination without cause. In 1988, they signed another agreement also providing for termination without cause. The employment of five of the plaintiffs was terminated effective May 1989, and the employment of the sixth was terminated effective May 1990, all allegedly without cause.

The Court of Appeal in *Marketing West, supra*, 6 Cal.App.4th 603, determined that the plaintiffs' March 6, 1990, complaint for breach of contract and breach of the implied covenant of good faith and fair dealing was barred by the applicable two-year statute of limitations. (The court determined, however, that the lower court had erred in granting summary judgment as to a fraud cause of action.) In reaching this conclusion, the reviewing court reasoned that the defendant had breached its initial oral agreement with the plaintiffs in November 1987 by threatening without good cause to terminate their contracts if they left the room without signing a new agreement. Accordingly, the statute of limitations began to run at the time of the threat. (*Id.* at p. 614.)

In *Marketing West, supra*, 6 Cal.App.4th 603, at the time of the November 1987 threat to terminate employment, the defendant repudiated the earlier contract and the plaintiffs accepted the repudiation and entered into a superseding written contract. By the time of the actual termination of employment in 1989 and 1990, the plaintiffs were performing under a written contract that provided for termination without cause. Therefore, the termination was not in violation of their current contract, but only of a contract that had been replaced by the new contract. This circumstance distinguishes *Marketing West* from the present matter, because here Rockwell does not claim that the parties treated the notification of termination as an actual rescission or termination of the employment contract. Nor does Rockwell claim that a new employment contract was created at the time of the notification of termination.

As discussed above, even if Rockwell's notification to Romano in December 1988 that his employment would be terminated on May 31, 1991, is treated as an anticipatory breach of contract, under established principles Romano could elect not to bring suit immediately, but instead await actual termination. Accordingly, we conclude that the statute of limitations applicable to the contract claims began to run at the time Romano's employment actually was terminated, and that the causes of action for breach of contract were timely filed.

## C.

We next consider Romano's claims under the FEHA. He maintained that the termination of his employment violated Government Code section

12940, which provides in pertinent part: "It shall be an unlawful employment practice . . . [¶] . . . [¶] For any employer, labor organization, employment agency, or person to *discharge*, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (f), italics added.)

In addition, Romano claimed the termination violated Government Code section 12941 because it was based on his age. That section provides in pertinent part: "It is an unlawful employment practice for an employer to refuse to hire or employ, or to *discharge*, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age, except in cases where the law compels or provides for such action." (Gov. Code, § 12941, subd. (a), italics added.)

Under the FEHA, the employee must exhaust the administrative remedy provided by the statute by filing a complaint with the Department of Fair Employment and Housing (Department) and must obtain from the Department a notice of right to sue in order to be entitled to file a civil action in court based on violations of the FEHA. (Gov. Code, §§ 12960, 12965, subd. (b); *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88 [276 Cal.Rptr. 130, 801 P.2d 373]; *Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1724 [35 Cal.Rptr.2d 181].) The timely filing of an administrative complaint is a prerequisite to the bringing of a civil action for damages under the FEHA. (*Accardi* v. *Superior Court* (1993) 17 Cal.App.4th 341, 349 [21 Cal.Rptr.2d 292]; *Denny* v. *Universal City Studios, Inc.* (1992) 10 Cal.App.4th 1226, 1232 [13 Cal.Rptr.2d 170].)

As for the applicable limitation period, the FEHA provides that no complaint for any violation of its provisions may be filed with the Department "*after* the expiration of one year from the date upon which the alleged *unlawful practice* or refusal to cooperate *occurred*," with an exception for delayed discovery not relevant here. (Gov. Code, § 12960, italics added.)

Government Code section 12940, subdivision (f), generally defines, as an unlawful employment practice, the "discharge" of an employee on the ground the employee has opposed illegal practices, as defined. Government Code section 12941 generally defines, as an unlawful employment practice, the "discharge" of an employee over the age of 40 years on the ground of age. In both instances, "discharge" on the forbidden grounds is an unlawful employment practice. None of the other discriminatory practices outlined by the relevant statutes are alleged here. Accordingly, in this case, the relevant

unlawful practice for the purpose of the statute of limitations set out in Government Code section 12960 was plaintiff's "discharge."

■ We interpret statutory language according to its usual and ordinary import, keeping in mind the apparent purpose of the statute. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) When no ambiguity appears, we give statutory terms their plain meaning. (*People* v. *Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

■ In the employment law context, the usual and ordinary meaning of the term "discharge" is to terminate employment. (See Black's Law Dict. (6th ed. 1990) p. 463, col.2 [defining "discharge" in the employment context as: "To dismiss from employment; to terminate the employment of a person."].) No other meaning is suggested by the context or history of the relevant sections, nor has any been suggested to us by Rockwell. It is evident that the purpose of the FEHA, to the extent it defines the term "unlawful employment practice" as including improper discharge, is to protect employees from loss of employment based on prohibited grounds. (See Gov. Code, §§ 12920, 12921.)

As noted above, by the terms of Government Code section 12960 the limitations period applicable to administrative claims begins to run "after" the unlawful employment practice has "occurred." If the administrative complaint must be filed within one year "after" the unlawful practice—here, a discharge—"occurred," then for the purpose of that complaint, the administrative cause of action must accrue and the statute of limitations must run from the time of actual termination. It would not run from the earlier date of notification of discharge, because on that date the unlawful practice (that is, the discharge) had not yet "occurred."

Such an interpretation is consistent with the plain meaning of the statutory language. It is also consistent with the remedial purpose of the FEHA to safeguard the employee's right to seek, obtain, and hold employment without experiencing discrimination. (See Gov. Code, §§ 12920, 12921; *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 243 [5 Cal.Rptr.2d 782, 825 P.2d 767]; *Usher* v. *American Airlines, Inc.* (1993) 20 Cal.App.4th 1520, 1525 [25 Cal.Rptr.2d 335].)

The FEHA itself requires that we interpret its terms liberally in order to accomplish the stated legislative purpose. (Gov. Code, § 12993, subd. (a); see also *Robinson* v. *Fair Employment & Housing Com., supra,* 2 Cal.4th at p. 243.) In order to carry out the purpose of the FEHA to safeguard the

employee's right to hold employment without experiencing discrimination, the limitations period set out in the FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits. The Hawaii Supreme Court has interpreted the statute of limitations applicable to claims under that state's law against discrimination in employment as running from the date of actual termination, and not from notification of termination, observing that most employees become aware of and begin to pursue their legal remedies for unlawful discharge only after the dismissal has occurred. (*Ross* v. *Stouffer Hotel Co. (Hawai'i) Ltd.* (1994) 76 Hawaii 454 [879 P.2d 1037, 1045] (*Ross*).) If the statute of limitations for claims of discrimination ran from the date of notification of dismissal, many employees would fail to invoke the protection of the state's antidiscrimination laws in a timely manner. (*Ibid.*) As the Hawaii court concluded, in addition to being consistent with the plain meaning of the statute (which is similar to our own), a construction of the limitation period that favors adjudication on the merits is more consistent with the remedial purpose of the law than one likely to bar potentially meritorious claims. (*Ibid.*)

Further, as the same court observed, such a rule does not impose an undue burden on employers by forcing them to defend stale claims. First, the period between notification and termination usually is short. (*Ross, supra,* 879 P.2d at p. 1045.) Second, both dates are within the employer's control, and the employer may secure or retain evidence in case a claim should arise. (*Ibid.*) Because the employer has this control, it may engage in a rational economic decision whether a long period between notification and termination is economically worthwhile in light of the burden of documenting and defending any claim that might ensue at the deferred termination date.

In addition, as the Court of Appeal pointed out below, such a rule has the obvious benefit of simplicity. Unlike notice of termination, which frequently is oral and may be conditional or equivocal, the date of actual termination is a date that in most cases is subject to little dispute.

Further, a holding that the statute of limitations on a claim under the FEHA runs from the time of notification of termination would promote premature and potentially destructive claims, in that the employee would be required to institute a complaint with the Department while he or she still was employed, thus seeking a remedy for a harm that had not yet occurred. In the present matter, for instance, such a rule would require that Romano commence his FEHA claim while he had at least another year and a half to work for Rockwell. As the Court of Appeal emphasized below, such a rule would reduce sharply any chance of conciliation between employer and employee and draw the Department into investigations that might have been

avoided through informal conciliation. (See also *Ross, supra*, 879 P.2d at p. 1045, fn. 7.) Such a rule also would place upon the courts of this state the burden of prematurely adjudicating claims that a termination in violation of the FEHA has occurred. We conclude, therefore, that the date that triggers the running of the limitations period under the FEHA is the date of actual termination.

Other states also have reached the same conclusion in interpreting statutes of limitations applicable to claims under state laws prohibiting unlawful employment practices. In New Jersey, for example, the state Conscientious Employee Protection Act prohibits an employer from taking "retaliatory action" against an employee for, among other things, disclosing or refusing to participate in the employer's illegal practices. Because the state statute defined the term "retaliatory action" to include "discharge," which the reviewing court in turn interpreted to mean actual termination, the applicable statute of limitations ran from the date of discharge, rather than from the notification of impending discharge. (*Keelan* v. *Bell Communications* (App.Div. 1996) 289 N.J.Super. 531 [674 A.2d 603, 606-607].) The Montana Supreme Court also has interpreted the statute of limitations applicable to that state's Wrongful Discharge From Employment Act as running from the date of termination of employment, rather than from the notification of termination. (*Allison* v. *Jumping Horse Ranch, Inc.* (1992) 255 Mont. 410 [843 P.2d 753, 754-755, 19 A.L.R.5th 972].) The state statute, which preempts common law remedies for claims such as breach of the covenant of fair dealing in the employment context, contains a statute of limitations that runs from the "date of discharge." In turn, "discharge" is defined by statute as including both constructive discharge and "any other termination of employment." The court concluded the statute of limitations ran from actual termination of employment—that is, a complete severance of the relationship of the employer and the employee—rather than from notification of termination. (*Id.* at pp. 754-755; see also *Harris* v. *Home Sav. and Loan Ass'n* (La.Ct.App. 1995) 663 So.2d 92, 94 [statute of limitations for claims under Louisiana's Age Discrimination in Employment Act runs from actual termination, not notification, because claim under act requires injury, which would not have occurred before actual termination]; *Janikowski* v. *Bendix Corp.* (6th Cir. 1987) 823 F.2d 945, 949 [concluding Michigan Supreme Court would hold that the statute of limitations governing that state's civil rights statute runs from the date of actual termination, not from the date of notification of termination].)

Rockwell counters that related federal authority requires that we select the date of notification of termination as the event that commences the running of the statute of limitations. Rockwell relies upon the decisions of the United

States Supreme Court in *Delaware State College* v. *Ricks* (1980) 449 U.S. 250 [66 L.Ed.2d 431, 101 S.Ct. 498] (*Ricks*) and *Chardon* v. *Fernandez* (1981) 454 U.S. 6 [70 L.Ed.2d 6, 102 S.Ct. 28] (*Chardon*), as well as lower federal court and state court authority applying these decisions.[1]

In *Ricks, supra*, 449 U.S. 250, the court applied the statute of limitations applicable to claims of unlawful employment practices under title VII of the Civil Rights Act of 1964 (42 U.S.C.S. § 2000e et seq. (title VII)) and 42 United States Code section 1981, in determining that a college professor who had been notified he would not receive tenure and who was offered a one-year "terminal contract" had waited too long to file his complaint with the Equal Employment Opportunity Commission. The applicable statute of limitations, requiring the filing of a complaint "within one hundred and eighty days after the alleged unlawful employment practice occurred" (42 U.S.C. § 2000e-5(e)(1)), ran, the court declared, from the date the employee was notified he had failed to gain tenure, and not from the date the "terminal contract" ended. The court reasoned that the discriminatory practice *alleged* was the denial of tenure, and that the eventual termination of employment was simply an inevitable consequence of that act. (*Ricks, supra*, 449 U.S. at pp. 257-258 [66 L.Ed.2d at pp. 439-440].) The employee's claim that the university engaged in continuing acts of discrimination culminating in the expiration of the "terminal contract" was rejected as inconsistent with the allegations of the complaint. (*Id.* at p. 257 [66 L.Ed.2d at p. 439].) The employee failed to identify any act of further discrimination, and the court declared that under the circumstances: "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." (*Ibid.*)

In *Chardon, supra*, 454 U.S. 6, several nontenured administrators in the Puerto Rico Department of Education filed complaints alleging that their employment had been terminated in violation of 42 United States Code section 1983. Each was informed prior to June 18, 1977, that his or her appointment would terminate on a specified date between June 30 and August 8, 1977. The high court held that the filing of a complaint on June 19, 1978, failed to meet the applicable one-year limitations period, because under *Ricks, supra*, 449 U.S. 250, the causes of action ran from the date of notification of termination. The court rejected the lower court's effort to distinguish *Ricks* on the ground the opinion involved a denial of tenure,

---

[1]Indeed, Rockwell urges that these cases direct the outcome not only as to Romano's FEHA claims, but also as to his tort and contract claims. No reason exists, it alleges, for a rule as to the nonstatutory causes of action different from that applied to the FEHA claims. Because we reject the claim as applied to the FEHA, we do not consider it in connection with the nonstatutory claims.

stating that in both *Ricks* and *Chardon*, the decision to terminate had been made and notice thereof had been given before actual termination. The court explained: "In *Ricks*, we held that the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful. [Citation.] The fact of termination is not itself an illegal act. In *Ricks*, the alleged illegal act was racial discrimination in the tenure decision. [Citation.] Here, respondents allege that the decision to terminate was made solely for political reasons, violative of First Amendment rights. There were no other allegations, either in *Ricks* or in these cases, of illegal acts subsequent to the date on which the decisions to terminate were made." (*Chardon*, *supra*, 454 U.S. at p. 8 [70 L.Ed.2d at p. 9], original italics.)

As the Court of Appeal in the present case pointed out, we are not bound by these decisions, because they interpret a federal statutory scheme not at issue here. In *Ricks*, *supra*, 449 U.S. 250, at least, the court was at pains to assert that it was the denial of tenure, and not the ultimate dismissal, that was the discriminatory act *alleged* by the plaintiff. In *Chardon*, *supra*, 454 U.S. 6, too, the plaintiffs' allegations focused on the *decision* to terminate employment as the discriminatory act. The dismissals were merely the inevitable result.

In the nonacademic setting, notification of termination is not comparable to a denial of tenure—termination is not the inevitable result, because in the nonacademic setting termination of employment does not ensue inevitably once notification of termination has been given. Further, and more significantly, unlike the interpretation of federal law offered in *Ricks*, *supra*, 449 U.S. 250, and *Chardon*, *supra*, 454 U.S. 6, under the FEHA a discriminatory *discharge* is defined as an unlawful employment practice. Because the FEHA defines an improper "discharge" as among the statute's unlawful employment practices, and because it provides that no complaint may be filed after the expiration of a year from the date the unlawful practice "occurred," it would be anomalous for us to conclude that the limitations period for that unlawful practice begins to run prior to discharge.

In addition, we question the reasoning of the high court's decisions in this respect. To the extent the civil rights plaintiffs in those cases argued their employers wrongfully had repudiated an obligation imposed by law not to discharge employees on a prohibited ground, on basic contract principles (as discussed in the preceding section) the employees should not be required to bring a lawsuit before discharge. As Justice Brennan maintained in his dissent in *Chardon*, *supra*, 454 U.S. 6, the majority's decision "has no analogue in customary principles of limitations law. See 4 A. Corbin, Contracts § 989 (1951) ('The plaintiff should not be penalized for leaving to

the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitations is held to begin to run against him immediately'). [¶] The thrust of the Court's decision is to require a potential civil rights plaintiff to measure the time for filing his claim from the moment some form of injunctive relief first becomes available. The effect of this ruling will be to increase the number of unripe and anticipatory lawsuits in the federal courts—lawsuits that should not be filed until some concrete harm has been suffered, and until the parties, and the forces of time, have had maximum opportunity to resolve the controversy." (*Chardon, supra,* 454 U.S. at p. 9 [70 L.Ed.2d at p. 9] (dis. opn. of Brennan, J.).)

It is true, as Rockwell argues, that courts of this state have relied upon federal authority interpreting title VII in determining the meaning of analogous provisions of the FEHA. (See, e.g., *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1245-1246 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; *Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 475-476 [4 Cal.Rptr.2d 522]; *Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316 [237 Cal.Rptr. 884].) As is evident, however, the FEHA defines a "discharge" as a discriminatory practice, a circumstance that distinguishes the FEHA from the federal law's focus (as interpreted in *Ricks, supra,* 449 U.S. 250, and *Chardon, supra,* 454 U.S. 6) on the *decision* to discriminate. In addition, as noted, we question the soundness of the reasoning of the high court's decisions in *Ricks* and *Chardon,* and do not find those decisions persuasive as applied to the FEHA.

Rockwell points out that some states have elected to follow *Ricks, supra,* 449 U.S. 250 and *Chardon, supra,* 454 U.S. 6, in interpreting state laws prohibiting discrimination in employment, concluding that the statute of limitations for claims under such enactments begins to run at the time of notice of discharge, rather than on the date of actual discharge. In addition, federal courts have been bound by high court authority interpreting federal enactments. (See, e.g., *Quicker* v. *Colorado Civil Rights Com'n* (Colo.Ct.App. 1987) 747 P.2d 682, 683; see also Annot. (1994) 19 A.L.R.5th 439 [collecting cases]; and see *Thurman* v. *Sears, Roebuck & Co.* (5th Cir. 1992) 952 F.2d 128, 133-134 [reviewing federal court of appeals cases and concluding Texas would follow federal law in interpreting limitations period in Texas antidiscrimination statute]; *Calhoun* v. *Federal Nat. Mortg. Ass'n* (11th Cir. 1987) 823 F.2d 451, 455-456 [interpreting federal Age Discrimination in Employment Act]; *Daniels* v. *Fesco Div. of Cities Service Co.* (9th Cir. 1984) 733 F.2d 622, 623 [concluding that because of California's tradition of relying on federal law in employment matters, California would follow federal rule in wrongful discharge action].) Other

courts, however, have distinguished or refused to follow *Ricks, supra,* 449 U.S. 250, and *Chardon, supra,* 454 U.S. 6, in interpreting state antidiscrimination statutes. (See *Ross, supra,* 879 P.2d at pp. 1043-1044; *Keelan* v. *Bell Communications, supra,* 674 A.2d at p. 607; *Harris* v. *Home Sav. and Loan Ass'n, supra,* 663 So.2d at pp. 95-96; *Janikowski* v. *Bendix Corp., supra,* 823 F.2d at pp. 949-951 [interpreting Texas law].) Certainly there is a division of opinion on the point. In light of the language and purpose of the FEHA, however, and the policy reasons recited above, we conclude that the authorities cited by Rockwell are not persuasive.

Rockwell urges that we follow the lead of the Court of Appeal in *Regents of University of California* v. *Superior Court* (1995) 33 Cal.App.4th 1710 [39 Cal.Rptr.2d 919] (*Regents*). In that case, a third year surgical resident was told in March 1992 she would have to repeat the third year of her residency or leave the program, although she would be permitted to work for one year in a laboratory position before deciding whether to repeat the year of residency. Instead of repeating her third year, the plaintiff worked in the laboratory for the next academic year, from July 1992 to June 1993. She left the residency program at the end of June 1993 rather than repeat the third year of residency, and thereafter, on July 12, 1993, filed a claim with the Department. The Court of Appeal relied on *Ricks, supra,* 449 U.S. 250, in determining that the statute of limitations on the former resident's claim alleging sex discrimination in violation of the FEHA ran from the date she was notified of the decision to require that she repeat the third year, rather than the date she ultimately left the residency program. The court observed that the situation was analogous to that in *Ricks,* stating: "We believe the situation here is analogous to the failure to qualify for tenure in *Ricks.* Steinsapir [the plaintiff] failed to qualify for fourth year residency and her employment at UCSD was scheduled to end at the close of the next academic year if Steinsapir did not repeat her third year: termination of employment was a 'delayed, but inevitable, consequence' of not graduating from—and not repeating a year in—the residency program." (*Regents, supra,* 33 Cal.App.4th at p. 1717.)

In the *Regents* case, however, the plaintiff apparently did not argue that the terms of the FEHA required that the limitations period run from the date of termination. Rather, plaintiff apparently conceded that *Ricks* applied, but unsuccessfully tried to persuade the court that she had been subject to continuing violations of the FEHA—a circumstance that would cause the limitations period to run anew from each subsequent violation. Because the plaintiff framed her argument in this way, the court had no occasion to examine the questions of statutory interpretation discussed above. In sum, we are not persuaded by this authority that the limitations period under the

FEHA for an actual discharge should begin to run at the point the employee is notified that his or her employment will be terminated, and any contrary assertion in the *Regents* case is disapproved.

Finally, Rockwell argues that a rule providing that the statute of limitations begins to run from the date of actual termination represents poor public policy, because it would punish compassionate employers. Such a rule, it maintains, will discourage employers from providing advance notice or other severance benefits, such as those offered here by Rockwell, to cushion the economic blow of employment termination. It argues, too, that such a rule would be unfair because it would permit employees "to have their cake and eat it too"—to retain severance benefits and wait to sue until actual termination.

As we already have observed, the rule we propose to adopt does not burden employers unduly, because they have control over the date of notification of termination as well as the date of actual termination. Employers who recognize that the statute of limitations begins to run at the time of termination will have the ability to establish a record at the time of notification of discharge, demonstrating the propriety of the termination. Accordingly, the purpose of the statute of limitations, to protect against stale claims as to which evidence may be lost or memories faded, would be served adequately by the rule proposed. Nor do we believe it likely that such a rule will discourage employers from offering generous severance packages. We perceive minimal connection between severance benefits and the statute of limitations, apart from a hope on the part of the employer that the severance package will forestall any claim of wrongful termination. If the employer's object in offering such a package is, as Rockwell suggests, to purchase exoneration from any claim of wrongful termination, such an object may be secured directly through an express agreement in which the employee waives any potential claims. (See, e.g., *Skrbina* v. *Fleming Companies* (1996) 45 Cal.App.4th 1353, 1366-1370 [53 Cal.Rptr.2d 481].) It is not necessary or appropriate to employ the statute of limitations as a tool to obtain immunity from liability, in the absence of such an express agreement. To the extent Rockwell may be understood to ask this court to adopt a rule that discourages lawsuits alleging wrongful termination by setting the statute of limitations to run at a time that makes it inconvenient or impossible for the employee to bring a lawsuit, we decline to do so. We do not view the statute of limitations as properly performing such a function.

### D.

Finally, we consider the statute of limitations question with regard to plaintiff's tort cause of action. ■ The statute of limitations does not

begin to run in a tort action until "plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy . . . ." (*Davies* v. *Krasna, supra,* 14 Cal.3d at p. 513; see also 3 Witkin, Cal. Procedure, *supra,* Actions, § 351, p. 380 ["The cause of action ordinarily accrues when, under the substantive law, the wrongful act is done and the obligation or liability arises, i.e., when a suit may be brought." (Italics omitted.)].)

Plaintiff's complaint alleged a claim of wrongful termination in violation of public policy. In recognizing such a tort claim, we have acknowledged that limits exist on an employer's power of dismissal, even as to employees whose employment may be terminated at the will of either party. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (*Tameny*).) In *Tameny*, we declared that "when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Id.* at p. 170.) We explained that an employer lacks authority to require the employee to commit an illegal act as a condition of continued employment, and declared that the employer may not coerce employees' compliance with unlawful directions by *discharging* an employee who refuses to follow the employer's order to perform such an illegal act. (*Id.* at p. 178.) We concluded: "An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." (*Ibid.*)

We have reaffirmed that "while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680] [plaintiff alleging wrongful discharge in violation of public policy must show violation of public policy based on constitutional or statutory provisions]; see also *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 668-669 [254 Cal.Rptr. 211, 765 P.2d 373].)

Because the cause of action recognized in *Tameny, supra,* 27 Cal.3d 167, is defined primarily as a limitation imposed by law on the employer's power of dismissal, *dismissal* on improper grounds is a breach of duty. Accordingly, when an employee alleges that his or her employment has been terminated in violation of public policy, a cause of action will accrue at the time of dismissal for the purpose of the statute of limitations.

It is important to recall that, in the present matter, the interval between notification and actual termination of employment was two and a half years.

During that time, Romano received his usual compensation and hoped to be able to secure a reversal of the termination decision. Indeed, he succeeded in outlasting the manager who had arranged for his ouster. As we observed in connection with the FEHA claims discussed above, there is little reason to require the employee to bring a claim when the termination decision still may be reversed and compensation may never be interrupted.

The Court of Appeal in *Shoemaker* v. *Myers* (1992) 2 Cal.App.4th 1407 [4 Cal.Rptr.2d 203], reached the same conclusion—that a *Tameny* claim accrues at the time of actual termination. The court found that, in the context of a plaintiff's obligation under the Government Tort Claims Act (Gov. Code, § 810 et seq.) to make a claim with a governmental entity within 100 days after accrual of the cause of action in order to preserve a right to bring a civil suit against such an entity, claims based on discharge in violation of public policy accrue on the date of termination and must be filed within 100 days of that date. (2 Cal.App.4th at p.1427.) Relying on our decision in *Davies* v. *Krasna, supra,* 14 Cal.3d 502, the court rejected the trial court's unexplained use of an earlier triggering date and declared: "Until plaintiff was terminated, he did not suffer appreciable harm sufficient to justify legal action. It was this termination which gave life to [the relevant causes of action.] Therefore, neither claim is time barred." (*Shoemaker* v. *Myers, supra,* 2 Cal.App.4th at p. 1427.)

In support of a contrary conclusion, defendants assert that in *Regents, supra,* 33 Cal.App.4th 1710, the Court of Appeal held that a claim of wrongful termination in violation of public policy accrues when the employee is notified that his or her employment will be terminated, not on the date of termination. Indeed, as noted above, the Court of Appeal in that case held that the statute of limitations for claims under the FEHA begins to run when the adverse employment decision is communicated to the employee, not at termination. (*Regents, supra,* 33 Cal.App.4th at pp. 1716-1717.) We have concluded above that this holding should be disapproved. As for the court's treatment of the plaintiff's *Tameny* claim, the Court of Appeal in *Regents* framed the issue as one involving constructive discharge, and concluded the commencement of the limitations period for constructive discharge cannot rest solely in the employee's control, thus rejecting the employee's date of resignation as the date that triggers the running of the statute of limitations for the purpose of constructive discharge. (*Id.* at pp. 1721-1723.) The court failed to consider the limitations period for the *Tameny* cause of action on any other theory. The concern of the Court of Appeal that the accrual of the cause of action and the commencement of the limitations period should not rest in the employee's sole control is not implicated in the case of an actual discharge, however.

We note that the Colorado Supreme Court has concluded that because a tort cause of action for termination in violation of public policy does not accrue until there is "a concurrence of tortious conduct and actual injury or damages caused by the tortious conduct," and because the employee does not suffer actual injury or damage when he or she is notified that employment will be terminated in the future, the date of notification of termination is not the date from which the statute of limitations begins to run. (*Martin Marietta Corp.* v. *Lorenz* (Colo. 1992) 823 P.2d 100, 115.) On the date of notification, the employer "retained the power to retract the notice of termination and thereby prevent the onset of actual injury to [the employee] as a result of his termination." (*Ibid.*) The time of actual discharge, the court concluded, is the date on which the limitations period begins to run on this tort claim, regardless of the "analytically distinct" question of when the limitations period should begin to run for any statutory claim. (*Id.* at p. 116.)

Because a cause of action for wrongful discharge in violation of public policy accrues at the time of termination of employment, we conclude that the statute of limitations applicable to such a cause of action begins to run at the time of actual termination.

III

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.[2]

Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.**—I concur in the judgment and in the majority opinion with the understanding that the majority opinion's discussion of *Delaware State College* v. *Ricks* (1980) 449 U.S. 250 [66 L.Ed.2d 431, 101 S.Ct. 498] does not imply that employment terminations resulting from denial of tenure would necessarily be subject to the holdings announced in this nontenure case.

---

[2]In view of this conclusion, we need not consider Romano's claims of continuing violation of the FEHA, or his claim that the applicable limitations periods should be equitably tolled because of alleged misconduct on the part of Rockwell.