Filed 12/6/23  Tustin Market Place I v. Mizu Sushi Bar & Grill CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TUSTIN MARKET PLACE I, LLC,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>MIZU SUSHI BAR & GRILL, INC.,<br><br>     Defendant and Appellant. | G061582<br><br>(Super. Ct. No. 30-2020-01148879)<br><br>O P I N I O N |
| TUSTIN MARKET PLACE I, LLC,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>KWANG LEE et al.,<br><br>     Defendants and Appellants. | G062057 |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge and Jonathan Cannon, Referee.  Affirmed.

Law Offices of Gregory W. Patterson and Gregory W. Patterson for

Defendants and Appellants Kwang Lee, Kyung Lee and Mizu Sushi Bar & Grill, Inc.

Bewley, Lassleben & Miller and Ernie Zachary Park for Plaintiff, Appellant and Respondent Tustin Market Place I, LLC.

\*　　　\*　　　\*

## INTRODUCTION

It is hard to imagine a business sector left untouched by the shockwaves of the COVID-19 pandemic. But restaurants were among the most deeply impacted by government closure orders and restrictions. Today, we consider the case of a Tustin restaurant which shut its doors for good because of the pandemic.

Or so it would seem. The restaurant's struggles to stay afloat predate the pandemic. Indeed, it has never made money. As such, its departure from the leased space prior to the expiration of its retail lease term under the guise of the pandemic left its landlord skeptical.

The restaurant and its owners blame their lack of success on the landlord, and of course, the landlord denies this. But blame is not our concern. In this case, we must decide whether the landlord is entitled to damages for the restaurant's abandonment of the premises. We agree with the trial court in concluding it is.

## FACTS

Kwang "David" Lee and his wife Kyung run a successful Asian restaurant in San Jose. In or around 2013, the couple decided they wanted to try to duplicate their success in Orange County. The concept behind their restaurant, Mizu Sushi Bar & Grill, is Japanese and Korean fare, including fresh sushi, served in-house. They wished to cater to a more high-end, eat-in clientele rather than takeout customers.

In May 2013, the Lees' company, Mizu Sushi Bar & Grill, Inc. (Mizu), signed a retail lease with the Irvine Company, LLC (TIC) for the premises located at 2881 El Camino Real in Tustin, which is located in the Tustin Market Place shopping center. Tustin Market Place is run by respondent Tustin Market Place I, LLC (Tustin 1)

2

and TIC assigned the lease to Tustin 1 in August 2018. The Lees guaranteed Mizu's obligations under its lease. The lease term was 10 years at a base monthly rent beginning at $19,687.17, incrementally going up over the course of the term to a maximum base rent of $24,458.71 per month.

In contrast to its San Jose counterpart, Mizu lost money every year of its operation, beginning in or around 2015. The reason for the lackluster performance isn't clear, but we do know one thing: the Lees blamed TIC and Tustin 1. Sometime shortly after the restaurant's opening, a fast food restaurant, Miguel's Jr., opened very close by. Mr. Lee told TIC that this took parking away from his potential customers. Then, in October 2014, TIC signed a lease with a competing Asian restaurant, allowing it to open in the vicinity.

When it came time for the first incremental increase in base rent, in March 2019, Mr. Lee wrote a letter to Tustin 1's senior general manager, Karol Reedy, demanding that Tustin 1 release Mizu from the lease effective July 1, 2019, and waive rent for April, May, and June. Mr. Lee expressed his frustration with what he viewed as "deleterious treatment" by TIC. He also accused TIC of misleading him regarding the availability of parking around his location and their intent to allow a competing restaurant to operate nearby.

On April 2, 2019, Reedy responded to Mr. Lee via letter, explaining the landlord could try to find a replacement tenant if Mizu would agree to vacate the space promptly after one was found. Mr. Lee did not so agree. Instead, he withdrew his demand, saying they would continue to "reevaluate [thei]r ability to continue MIZU operations on a monthly basis."

In August 2019, the Lees determined that they wished to change to a "shabu shabu" restaurant concept in order to right the ship. They sought permission to present plans to TIC for consideration. However, they did not follow through on presenting any plans.

Then the COVID-19 pandemic struck.  On March 12, 2020, Governor Gavin Newsom declared the pandemic a state of emergency and required all residents to heed state and local public health officials' guidance to control the spread of the novel coronavirus.  Four days later, the California Department of Public Health issued guidance to retail food and beverage establishments, urging them to close for indoor seated dining, and to offer only drive-through or other pick-up or delivery options.  By July 2020, however, restaurants were permitted to utilize outdoor seating so long as they complied with social distancing guidelines.

Mizu did not offer takeout or delivery options.  Instead, it chose to shut down the restaurant completely on March 16 in response to the pandemic.  Tustin 1 and Mizu executed an amendment to the lease by which 100 percent of Mizu's recurring monthly rent charges were deferred between April 1, 2020 and June 30, 2020.  But on April 28, 2020, Mr. Lee notified Tustin 1 via letter that Mizu would not be reopening, stating: "While the Landlord's 90-Day Rent Deferment was a temporary stopgap, we have determined that the reality is that . . . the extent of the long-term damaging repercussions of this crisis on our already-struggling MIZU will be too much of a financial burden for us to overcome."

On May 5, 2020, Reedy wrote an e-mail to Mizu representative David Cohn, expressing surprise at the decision.  She reminded Cohn that Mizu's obligation to pay April through June rent had been deferred until 2021 and could be paid back over 12 months with no penalty or interest.  She offered once again to find a replacement tenant.  However, she said the landlord was not amenable to simply accepting Mizu's security deposit of approximately $21,000 as a termination fee.  If Mizu wanted to terminate, she said the landlord would need a "substantial offer."  She urged Mizu to provide one.

Cohn responded with an offer to pay $83,420.90 to terminate the lease on May 13.  However, TIC's counsel, Ernie Park, rejected this proposal the following day in

4

an e-mail to Cohn stating: "The landlord expects the tenant to abide by the lease, including the obligation to pay rent as it falls due (as provided for therein)."

Several weeks later, on June 3, 2020, Mizu's counsel, Gregory Patterson, sent a letter to Park explaining Mizu's position that TIC was "not in a position to demand full performance on the lease" given both the pandemic and TIC's conduct prior thereto, which Patterson said "adversely affected" Mizu's business independent of the pandemic. Patterson reiterated Cohn's earlier offer, stating it would remain open until June 8.

Park responded on June 11, suggesting that Mizu "simply relinquish possession" of the restaurant so TIC could "commence mitigating its damages," adding: "Obviously, our acceptance of the premises would be for that purpose and without waiving our various rights and remedies." Park reiterated this point in a June 16, 2020 e-mail to Patterson, after Patterson indicated Mizu would indeed relinquish the premises.

On June 17, 2020, Reedy sent a letter to Mizu stating the lease would terminate and Mizu would be expected to vacate on June 23, 2020. Mizu did as instructed, vacating and returning the keys on June 23.

Tustin 1 filed a complaint against Mizu and the Lees on June 22, 2020, for breach of the lease and breach of the Lees' guaranty. The defendants answered and filed a cross-complaint for fraud, concealment, and breach of contract based on TIC's alleged interference with Mizu's success.

Pursuant to the lease, the parties' claims were heard by a court-appointed referee. The referee ruled in Tustin 1's favor. On July 13, 2022, the trial court entered judgment against Mizu for $1,066,079.72 in compensatory damages and additional attorney fees and costs.[1]

---

[1] The trial court initially declined to enter judgment individually against the Lees so Tustin 1 filed a cross-appeal to the judgment to protest their exclusion. However, the trial court later amended the judgment to include the Lees so Tustin 1's cross-appeal is now moot.

5

## DISCUSSION

Mizu[2] contends its obligation to operate the restaurant and pay rent terminated by operation of two things: (1) the pandemic as a force majeure, and (2) the June 17 letter from Tustin 1 formally terminating the lease. We disagree on both counts.

To be sure, the lease contained a force majeure clause at paragraph 21.9, providing that "[a]ny prevention, delay or stoppage due to . . . acts of God, . . . governmental restrictions, regulations, or controls . . . and other causes (except financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by that party for a period equal to the prevention, delay or stoppage, except the obligations imposed with regard to the payment of Rent to be paid by Tenant . . . ." The parties agree the COVID-19 pandemic constituted a force majeure.[3] But paragraph 21.9 expressly provided that Mizu's obligation to pay rent could not be suspended by a force majeure.

Mizu tries to get around this rent carve-out by arguing it is unconscionable. The referee rejected this argument. But we needn't reach that to conclude that Mizu breached the lease before it was due to make another rent payment.

California recognizes the "doctrine of breach of a contract by anticipatory repudiation." (*Guerrieri v. Severini* (1958) 51 Cal.2d 12, 18. (*Guerrieri*).) "'An anticipatory breach of contract occurs on the part of one of the parties to the instrument when he positively repudiates the contract by acts or statements indicating that he will not or cannot substantially perform essential terms thereof. . . .' (*Crane v. East Side Canal etc. Co.* [(1935)], 6 Cal.App.2d 361, 367.) 'Anticipatory breach must appear only with

---

[2] Mizu and the Lees filed separate notices of appeal and separate opening briefs. However, their arguments for overturning the judgment are virtually identical. In the interest of brevity, we refer only to Mizu by name in addressing the arguments, but our discussion applies to all three appellants.

[3] This is not always the case. In two recent cases, *SVAP III Poway Crossings, LLC v. Fitness Internat., LLC* (2023) 87 Cal.App.5th 882, 892-893 and *KB Salt Lake III, LLC v. Fitness Internat., LLC* (Sept. 26, 2023, B320562), __Cal.App.5th __ [2023 Cal.App.LEXIS 735, *24], Division One of our court and the Second District, Division Seven held COVID-19 closure orders did not constitute force majeure excusing the tenants' obligations to perform under their respective leases.

6

the clearest terms of repudiation of the obligation of the contract. (*Atkinson v. District Bond Co.* [(1935)] 5 Cal.App.2d 738; *Gold Min. & Water Co. v. Swinerton* [(1943)] 23 Cal.2d 19; 4 Cal.Jur.Supp. 197.' (*Hertz Driv-Ur-Self Stations, Inc. v. Schenley Distilleries Corp.* [(1953)] 119 Cal.App.2d 754, 760 . . . ." (*Guerrieri*, *supra*, 51 Cal.2d at p. 18.) "In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies – he or she may 'treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time.' (*Taylor v. Johnston* [(1975)] 15 Cal.3d [130,] 137; see also 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 806, p. 727.)" (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489.)

Paragraph 15.2 allowed Tustin 1 to terminate the lease, if it so chose, for any one of several enumerated defaults, including vacating or abandoning the premises. If Tustin 1 chose to terminate the lease pursuant to paragraph 15.2, it was entitled to damages, including "without limitation, the remedy and measure of damages specified pursuant to California Civil Code[4] Section 1951.2, which shall include the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of Rent loss Tenant proves could have been reasonably avoided."

When Mr. Lee sent his April 28 letter indicating Mizu would not reopen in the wake of COVID restrictions, he was repudiating the lease – Mizu intended to abandon it. At that point, Tustin 1 could either treat the repudiation as a breach and sue, or wait to see if Mizu would ultimately perform. It appears Tustin 1 chose the second

_____

[4]     All further statutory references are to the Civil Code.

option.  Mizu and Tustin 1/TIC negotiated in the ensuing weeks.  But by late May or early June, it was clear the two sides were at an impasse; Mizu had made up its mind to vacate and Tustin 1 was not willing to let it do so without exacting a heftier price than Mizu would pay.  Park and Reedy therefore suggested Mizu relinquish the premises sooner rather than later to allow Tustin 1 to mitigate damages from the vacancy.  And Mizu did so on June 23.  At this point, Mizu was in breach of the lease because it had actually abandoned it.

Mizu sees the situation differently.  From its perspective, Tustin 1 released it from the lease when Reedy sent her June 17 letter stating the lease would be terminated effective June 23.  Mizu had not defaulted on its rent payments as of June 23, so it claims Tustin 1 lacked the power to terminate the lease for cause under paragraph 15.2 and seek damages under section 1951.2.  Therefore, by Mizu's logic, the only way to view the June 17 letter and subsequent acceptance of the premises is as a full and complete release of Mizu from any future obligations under the lease.

We cannot agree with this.  For one thing, Mizu had already asked for a release in 2019, and Tustin 1 had not been willing to give it one unless a replacement tenant was found.[5]  This did not happen; indeed, Mizu never accepted Tustin 1's offer to use its own efforts to seek out a replacement tenant.  Additionally, when Tustin 1 suggested Mizu vacate the space by June 23, its counsel made clear Tustin 1 was reserving its rights and remedies under the lease.  Its acceptance of the premises was only for the purpose of mitigating damages and finding someone new to occupy the space.  So if Mizu believed it was being released from its lease obligations permanently, this belief was not reasonable under the circumstances.

---

[5]     This fact tends to undercut Mizu's claim that COVID-19 was a force majeure requiring it to shut down and vacate.  The reality was Mizu was already trying to find a way out of the lease even before the pandemic occurred.

Mizu responds that it could not have repudiated the lease because it never "put[] it out of [its] power to perform so as to make substantial performance of [its] promise impossible . . . ." (*Taylor v. Johnston, supra,* 15 Cal.3d at p. 137.) Specifically, it says it never did anything to make it impossible to pay rent. Even if it left the property, it could still have paid the rent.

We beg to differ. Paying rent was only one of Mizu's obligations under the lease. It was also required to operate its restaurant on the demised premises. Abandoning the premises made it impossible for it to comply with this obligation.

Mizu also contends the force majeure clause kicked in as soon as the government mandated the closure or restriction of certain businesses. Therefore, it claims, it was no longer obligated to operate a restaurant while the restrictions were ongoing. To start, we are not persuaded – nor, it seems, were Tustin 1 or TIC – that the COVID restrictions required Mizu to close its restaurant for the foreseeable future. Applicable public health guidance permitted curbside pick-up, takeout, and eventually, outdoor dining at a reduced capacity. Like many other businesses during the pandemic, Mizu faced the choice whether to adapt to new conditions or remain inert. We see no adequate explanation in the record for its decision to remain inert. Even though the restaurant was originally launched as an indoor dining restaurant, businesses invariably face headwinds in some form or another. Those who adapt survive, and those who refuse do not. The COVID restrictions cannot explain Mizu's failure or refusal to adapt.

But even if we agreed that closure was the only option, the force majeure clause only allowed Mizu to close for the time period the force majeure existed. It was a temporary suspension of performance. Here, Mizu was not temporarily suspending its performance; it was abandoning the lease, in its entirety, permanently. As such, the force majeure clause has little, if any, relevance here.

Finally, Mizu claims the referee erred by awarding Tustin 1 improper monetary relief. The referee found Mizu and the Lees should pay Tustin 1 $1,066,079.72

9

in compensatory damages. This figure included awards for unamortized tenant allowance and unamortized broker commissions involved with reletting the premises to a new tenant. Mizu contends these figures are outside the scope of the term "rent" as it was defined in the lease.[6]

This argument misses the mark because, as we have already concluded, Tustin 1 terminated the lease for cause under paragraph 15.2. Therefore, it was entitled to damages under section 1951.2, which allows the landlord to recover not only "[t]he worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided," but also "[a]ny other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom." (§ 1951.2, subd. (a).) This includes amounts Tustin 1 expended in procuring a new tenant.

## DISPOSITION

The judgment is affirmed. Respondent to recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.

---

[6] Article 3 of the lease defined "rent" as including base rent, percentage rent, additional rent and delayed opening rent.