Filed 6/1/22  JHM Ventures v. Cavalier Closeouts CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JHM VENTURES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CAVALIER CLOSEOUTS, INC.<br>et al.,<br><br>Defendants and Respondents. | B305724<br><br>Los Angeles County<br>Super. Ct. No. BC681286 |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County.  David Sotelo, Judge.  Affirmed.

LevatoLaw and Stephen D. Weisskopf for Plaintiff and Appellant.

Woolf & Nachimson and Chaim J. Woolf for Defendants and Respondents.

JHM Ventures (Plaintiff) filed a complaint against Cavalier Closeouts, Inc. and Eyal Dahan (together Defendants) alleging they breached written contracts related to three business deals. The court entered judgment for Defendants after finding Plaintiff failed to prove the existence of two of the alleged contracts, its claims were barred by the statute of limitations, and it failed to show it suffered damages. The court subsequently awarded Defendants attorney fees under Civil Code section 1717. On appeal, Plaintiff argues the court erred by (1) applying the wrong legal analysis in concluding its claims were barred by the statute of limitations, (2) finding it failed to prove damages, and (3) awarding Defendants attorney fees related to claims for which there were not written contracts in evidence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Jason Mitchell is the sole officer and director of JHM Ventures, which is a consulting and investment firm. Dahan is the owner of Cavalier Closeouts, Inc. (Cavalier), which is in the business of buying discount merchandise from manufacturers and selling it to retail companies like Ross and T.J. Maxx.

Mitchell and Dahan knew each other as children, but they were not close friends. They reconnected in 2011 at a trade show in Las Vegas. Dahan explained his business to Mitchell, and he claimed it was low risk with the potential for very large profits. Mitchell decided to go into business with Dahan.

1. *The Dereon Jeans Deal*

The parties' first deal involved the purchase of Dereon jeans (the Dereon Jeans Deal). They entered into a written contract on February 22, 2011, under which Plaintiff agreed to provide $80,000 to put toward the purchase of $160,000 worth of jeans. Cavalier, in turn, agreed to "[e]xercise due care and

2

diligence in fulfilling the order and sale of the Goods. Further it will do all [in] its power to maximize profits on the transactions related to the Goods." The contract contains an attorney fees provision stating "[i]n the unlikely event that legal action is taken by either party against the other, the prevailing party shall recoup from the losing party all legal costs and fees including attorneys' fees."

In accordance with the agreement, Plaintiff transferred $80,000 to Defendants. Defendants purchased the jeans from a supplier in Pakistan, but many turned out to be defective and unsellable. According to Dahan, due to the problems caused by the defective jeans, Mitchell agreed to end the deal in exchange for $125,000. Between September 2011 and March 2012, Defendants wrote Plaintiff a series of checks totaling $125,000. The last check, dated March 12, 2012, indicates it is for "Full & Final Payment Dereon Jeggings." According to Dahan, the words "full & final payment" signified that the deal was over. Mitchell also understood the March 2012 check to be the final payment on the deal.

## 2. *The Kids' Robes Deal*

According to Mitchell, sometime after entering into the Dereon Jeans Deal, the parties agreed to a second deal involving kids' robes and shirts (the Kids' Robes Deal). Mitchell claimed the parties entered into a short written contract stating the deal would be governed by the same terms as the Dereon Jeans Deal. Mitchell did not have a copy of the contract, and he believed it had been stolen during a home burglary. According to Plaintiff, Defendants failed to make the required payments under the agreement. Dahan denied making any deal with Mitchell related to kids' robes and shirts.

3

### 3.	*The Auction Deal*

Around November 2011, the parties agreed to another deal involving merchandise purchased from a federal customs auction (the Auction Deal).  Mitchell claimed that, like the Kids' Robes Deal, the parties entered into a short written contract stating the deal would be governed by the same terms as the Dereon Jeans Deal.  Also like the Kids' Robes Deal, Mitchell claimed his copy of the agreement had been stolen from his home during a burglary.  With Dahan's help, Mitchell purchased $90,270 worth of goods at the auction, which he insisted were all part of the Auction Deal.

Dahan acknowledged forming a deal with Mitchell related to the auction goods, but he denied that the parties had a written agreement.  According to Dahan, he guaranteed Mitchell the return of his initial investment and that they would split profits from any sales of the goods.  Dahan also claimed Mitchell took about $12,000 worth of goods purchased at the auction to sell through his own online business.  Therefore, according to Dahan, Mitchell's initial investment in the Auction Deal was roughly $78,000.

Sometime around December 2012, Dahan paid Mitchell $10,000 in connection with the deal.  Dahan claimed he subsequently paid Mitchell an additional $40,000 in cash, but Mitchell denied it.

In January 2013, Mitchell asked Dahan if they could set up a "disbursement plan for the remaining amounts" due.  Dahan told Mitchell he was sorry for the delay in payment, there were "absolutely no Christmas sales this year," and he would "pay off" as soon as possible.

4

About seven months later, on August 10, 2013, Mitchell sent Dahan an email "to check in . . . about the last $90k of the balance" owed on the deal. Mitchell believed Defendants owed him more than $90,000, but he was willing to accept a lesser amount to settle the deal.

Mitchell paid Dahan $10,000 sometime around September 2013. A few months later, Mitchell told Dahan it is "very important that we come up with some plan for the last $80k . . . ." Dahan responded that he was "pushing sales like crazy."

Dahan paid Mitchell another $10,000 in March 2014. In August 2014, Dahan told Mitchell he needed to sell more goods before he could make any additional payments. Mitchell responded that the "deal we made was that you personally guaranteed the amount and that it would be less than one year until full payback." Mitchell said that unless they could come to an immediate agreement on a payback plan, he had "no options other than to get attorneys involved . . . . [¶] Not paying the money or making arrangements for repayment is not an option without legal consequences."

The next month, Mitchell sent Dahan an email saying, "You agree with me about the remaining balance of 70k you know you had guaranteed personally and on your house, et cetera, that you would have paid it back years ago at this point, and yet despite my enormous patience with this whole thing with you, you're just twisting to even make a payment plan." He also wrote, "I just want the 70k that's owed and to be done with this." About two years later, in September 2016, Defendants paid Plaintiff an additional $2,000.

## 4.   *The complaint*

On October 26, 2017, Plaintiff filed a complaint against Defendants for breach of contract and an accounting. Plaintiff alleged Defendants breached their written agreements by failing to exercise due care and diligence, and by failing to do everything possible to maximize profits. Specifically, it alleged Defendants failed to seek a refund from the supplier for defective jeans, overbid on goods at the auction, failed to keep Plaintiff updated on the status of the sales, and failed to pay all monies owed under the agreements. In relief, Plaintiff sought, among other things, compensatory damages and attorney fees "pursuant to contract."

## 5.   *The trial*

The case proceeded to a bench trial. Mitchell and Dahan testified to their respective versions of events, as summarized above. Each side also presented testimony from Cavalier's bookkeeper, David Filoteo. According to Filoteo, the Auction Deal resulted in a net loss of $5,187.59. The Dereon Jeans Deal, however, made profits between $37,770.26 and $100,570.76. Filoteo could not calculate the exact profits because many of the records related to the deal had either been destroyed or seized by the police on an unrelated matter.

In their post-trial brief, Defendants argued Plaintiff's claims were barred by the statute of limitations. Plaintiff responded that its claims were timely because Defendants did not breach the agreements until September 2016, when they made the final $2,000 payment. Alternatively, it argued the statute of limitations was tolled under the delayed discovery rule.

The trial court issued a proposed statement of decision finding in Defendants' favor on all claims. As to the Dereon

Jeans Deal and Auction Deal, the court found Plaintiff's claims were barred by the statute of limitations. Specifically, it found the Dereon Jeans Deal claims were subject to a four-year statute of limitations, and the alleged breaches occurred no later than March 12, 2012, when Defendants gave Plaintiff a check stating it was for full and final payment. On the Auction Deal, the court found Plaintiff failed to prove the existence of a written contract. Nevertheless, it concluded the parties formed an oral contract, which is subject to a two-year statute of limitations. It further found Plaintiff was aware of the alleged breaches no later than August 2013, when it demanded $90,000 from Defendants. Plaintiff, however, did not file its complaint until October 2017, well beyond the statute of limitations for claims related to both deals.

The court alternatively concluded Plaintiff failed to prove it suffered damages on either deal. With respect to the Dereon Jeans Deal, the court found "Defendant[s] and Plaintiff realized the tremendous amount of returns and resales of the jeans because of their defects and decided to agree that Defendant[s] would pay Plaintiff his costs with a 50% profit margin. . . . Accordingly, Defendant[s'] payment of $125,000.00 was exactly what the parties agreed to." Alternatively, the court found Plaintiff received its initial investment plus $45,000 in profits, which was consistent with Filoteo's calculations showing total profits on the deal between $36,000 and $100,000.

On the Auction Deal, the court found Plaintiff made an initial investment of $78,000, the deal did not turn a profit, and Defendants repaid Plaintiff $70,000. The court concluded that, "[u]sing the likely extra moneys that Defendant overpaid on

7

[the Dereon Jeans Deal], it is clear that Plaintiff has suffered no damages."

As to the Kids' Robes Deal, the court found Plaintiff failed to prove it had any contract, written or oral, with Defendants.

Plaintiff did not object to the proposed statement of decision, which the court adopted as its final decision. The court entered judgment for Defendants.

**6.      *Defendants' motion for attorney fees***

Defendants subsequently moved for attorney fees under Civil Code section 1717 (section 1717). In opposition, Plaintiff argued Defendants were entitled to a third of their requested fees in light of the fact that the court found only one of the three deals involved a contract with an attorney fees provision.

The court rejected Plaintiff's argument and awarded Defendants $110,920 in attorney fees. The court explained that section 1717 "applies to all three contracts alleged here, based on Plaintiff's allegations, claims and testimony that Defendant[s] [were] liable on each written agreement that duplicated the Dereon [Jeans Deal] contract presented in court that 'clearly' allowed for attorney fees." Moreover, if "Plaintiff had prevailed, Defendants would have been liable for all of Plaintiff's attorneys' fees, even as to the two nonexistent (for trial) but alleged contracts."

Plaintiff separately appealed the court's judgment and its order awarding attorney fees. We consolidated the appeals.

## DISCUSSION

**1.      *The court did not err in finding the statute of limitations barred Plaintiff's claims***

Plaintiff contends the trial court "applied the wrong legal analysis" when it found the statute of limitations barred its

8

claims.  Specifically, it argues that because the parties had ongoing contractual obligations, the statute of limitations did not start to run until September 2016 at the earliest.  We conclude Plaintiff forfeited the issue and it also lacks merit.

The statute of limitations for breach of written contract is four years, and the statute of limitations for breach of oral contract is two years.[1]  (Code Civ. Proc., §§ 337, 339.)  Generally, the statute of limitations on a cause of action for breach of contract, whether written or oral, begins to run at the time of the breach.  (See *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806; *E.O.C. Ord, Inc. v. Kovakovich* (1988) 200 Cal.App.3d 1194, 1203.)  However, "when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract" or the time arrives for complete performance by the other party.  (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489–490 (*Romano*); see *State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1530 ["The statute of limitations on a cause of action for breach of an executory contract generally does not begin to run until the time for full performance has arrived."].)

In *Union Sugar Co. v. Hollister Estate Co.* (1935) 3 Cal.2d 740 (*Union Sugar*), for example, a party brought claims for breach of a beet farming contract that was to be carried out over the course of a farming season.  The Supreme Court held

---

[1]     Plaintiff does not challenge the trial court's finding that all of its claims, including its claims for an accounting, are subject to the statute of limitations for breach of contract.

the statute of limitations commenced when the farming season ended and the time for complete performance arrived, rather than the date of the initial breach.  (*Id.* at pp. 745–746.) Similarly, in *Ross v. Tabor* (1921) 53 Cal.App. 605, the court held the statute of limitations for breach of a three-year-long beekeeping contract started to run at the end of the three-year term, rather than when the defendant first breached the contract. (*Id.* at p. 615.)

Here, the trial court found Defendants' alleged breaches occurred no later than August 2013, which was more than four years before Plaintiff filed the complaint in October 2017. Plaintiff does not meaningfully dispute those findings.  Instead, as we understand its argument, it contends the trial court erred because it failed to consider that the parties' contractual obligations continued after the alleged breaches.  Therefore, Plaintiff suggests, the breaches did not commence the limitations period.  Rather, the statute of limitations started to run no earlier than September 2016, when Defendants made the final $2,000 payment.

Initially, we agree with Defendants that Plaintiff forfeited this issue by failing to raise it in the trial court.  " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal.  A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.  [Citation.]' " (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)

Plaintiff did not raise the continuing obligations theory in the trial court.  Instead, in its post-trial brief, Plaintiff argued

10

its claims were timely because Defendants first breached the agreements no earlier than September 2016. Alternatively, it argued the statute of limitations was tolled under the delayed discovery rule. At no point did Plaintiff argue that, despite Defendants' breaches, the statute of limitations did not begin to run because the parties had ongoing contractual obligations. Nor did it object to the trial court's proposed statement of decision on the basis that it failed to address that issue. Under these circumstances, it would be unfair to the trial court and unjust to Defendants to permit Plaintiff now to assert the ongoing obligations theory. Plaintiff's failure to raise the issue below forfeits it on appeal.[2] (See *Barker v. Brown & Williamson Tobacco Corp.* (2001) 88 Cal.App.4th 42, 50 [finding a plaintiff waived an argument that delayed discovery prevented the statute of limitations from running by failing to raise the theory in the trial court].)

Even if we overlooked Plaintiff's forfeiture, we would reject its argument on the merits. As to the Dereon Jeans Deal, Plaintiff suggests that, because the parties did not specify a date by which Defendants were required to sell the goods, there was no deadline for performance and their contractual obligations continued indefinitely. Plaintiff is mistaken. Where, as here, a contract does not specify a time for performance, the party must

---

[2] A reviewing court has discretion to consider a new theory on appeal if it presents a question of law based on undisputed facts. (*Cox v. Griffin* (2019) 34 Cal.App.5th 440, 450.) That is not the case here. As discussed more fully below, the question of whether Defendants had ongoing contractual obligations implicates unresolved factual issues related to the deadline for Defendants' performance.

11

perform within a reasonable time. (Civ. Code, § 1657; *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 30; *Palmquist v. Palmquist* (1963) 212 Cal.App.2d 322, 331; see *Caner v. Owners' Realty Co.* (1917) 33 Cal.App. 479, 481 [where a contract does not specify a time for performance, the statute of limitations begins to run at the expiration of a reasonable time].) What is a reasonable time is a question of fact that depends on the situation of the parties, the nature of the transaction, and the facts of the particular case. (*The McCaffrey Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1351.)

We need not decide what is a reasonable time for Defendants' performance, however, because the trial court's unchallenged findings show the contract ended in March 2012. Specifically, the court found that due to the large number of defective jeans, the parties agreed to end the deal once Defendants paid Plaintiff $125,000, representing its initial investment plus a 50 percent return. Plaintiff does not challenge that finding. Nor does it challenge the court's finding that Defendants paid Plaintiff $125,000 by March 2012. Once Defendants made the final payment, neither party had ongoing obligations related to the Dereon Jeans Deal, and the statute of limitations started to run on any alleged breaches. Because the statute of limitations for breach of a written contract is four years, absent some other basis to toll the limitations period, Plaintiff was required to file a complaint no later than March 2016. Instead, it filed its complaint in October 2017, more than a year and a half after the statute of limitations had expired.

Plaintiff insists Defendants' contractual obligations under the Dereon Jeans Deal continued beyond March 2012. In support, it points to evidence showing Defendants continued

12

to make payments until September 2016 and continuously acknowledged they owed Plaintiff money. There is no evidence, however, that any of those payments or acknowledgements concerned the Dereon Jeans Deal. In fact, the undisputed evidence shows both parties believed Defendants made the final payment on the Dereon Jeans Deal sometime around March 2012.

As to the Auction Deal, Plaintiff similarly contends the parties' contractual obligations were ongoing because their oral agreement was silent as to the deadline for Defendants to sell the goods. The trial court, however, did not expressly decide whether the parties agreed to a deadline for Defendants' performance. (See *Esbensen v. Userware Internat., Inc.* (1992) 11 Cal.App.4th 631, 640 [the exact terms of an oral agreement is a question for the trier of fact to decide].) Because Plaintiff did not bring this omission to the court's attention, under the doctrine of implied findings, we must "presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.)

Here, there is substantial evidence from which the court could have found the parties agreed that Defendants were required to fully perform more than two years before Plaintiff filed its complaint. In August 2013, for example, Mitchell demanded Dahan pay the "last" $90,000 due under the agreement, which implied the deadline for Defendants' performance had already passed. About a year later, Dahan

13

informed Mitchell he could not make any additional payments until he sold more goods.  Mitchell did not accept that excuse, and he threatened legal action because the "deal we made was that you personally guaranteed the amount and that it would be less than one year until full payback."  Mitchell, in other words, claimed that under the terms of the deal, Defendants were required to make full payment within a year.  Dahan did not deny that claim.  The next month, in September 2014, Mitchell reminded Dahan he "guaranteed" payment "years ago at this point."  Dahan again did not deny Mitchell's claim.

Under the doctrine of implied findings, we must presume the trial court accepted this evidence and concluded the parties agreed Defendants' full performance was due by August 2013 at the very latest.  Once the time for Defendants' full performance arrived, the statute of limitations started to run on any alleged breaches.  (See *Romano, supra*, 14 Cal.4th at pp. 489–490; *Union Sugar, supra*, 3 Cal.2d at pp. 745–746.)  Because the statute of limitations for breach of oral contract is two years, absent some other basis to toll the limitations period, Plaintiff was required to file a complaint no later than August 2015.  Instead, it filed its complaint in October 2017.  Accordingly, the trial court properly found the statute of limitations barred Plaintiff's claims.[3]

---

[3]     Because we conclude the trial court properly found Plaintiff's claims were time-barred, we need not consider Plaintiff's arguments that the trial court erred in finding it failed to prove damages.

14

**2.** ***The court properly awarded Defendants their attorney fees***

Plaintiff contends the trial court erred in awarding Defendants attorney fees related to the claims involving the Kids' Robes Deal and the Auction Deal. We disagree.

We review "a determination of the legal basis for an award of attorney fees de novo as a question of law." (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 677.) A party may recover its attorney fees when authorized by contract. (Code Civ. Proc., § 1021; *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 127.) Under section 1717, where a "contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

It is "settled" that a party is entitled to attorney fees under section 1717 " 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.' [Citations.] [¶] This rule serves to effectuate the purpose underlying section 1717. As [the Supreme Court] has explained, '[s]ection 1717 was enacted to establish mutuality of remedy where [a] contractual provision makes recovery of attorney's fees available for only one party [citations], and to prevent oppressive use of one-sided attorney's fees provisions. [Citation.]' [Citations.] The statute would fall short of this goal of full mutuality of remedy if its benefits were denied to parties

15

who defeat contract claims by proving that they were not parties to the alleged contract or that it was never formed.  To achieve its goal, the statute generally must apply in favor of the party prevailing on a contract claim whenever that party would have been liable under the contract for attorney fees had the other party prevailed." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870–871 (*Hsu*).)

In *Jones v. Drain* (1983) 149 Cal.App.3d 484, for example, the defendants entered into a written listing contract with Sears Realty to sell their home, and Sears Realty entered into an oral agreement with the plaintiff to act as a cooperative broker to find a purchaser for the property. (*Id*. at p. 485.)  The plaintiff sued the defendants for breach of contract after they rejected offers from potential purchasers that the plaintiff had located, and it sought attorney fees under the contract. (*Id*. at p. 487.)  The trial court granted summary judgment in the defendants' favor— apparently on the basis that the parties did not have a contract —but it denied the defendants' request for attorney fees. (*Id*. at p. 486.)  The Court of Appeal reversed, holding the defendants were entitled to their attorney fees under section 1717 because the plaintiff would have been entitled to such fees had it prevailed. (*Id*. at pp. 489–490.)  The court reasoned "it is extraordinarily inequitable to deny a party who successfully defends an action on a contract, which claims attorney's fees, the right to recover its attorney's fees and costs simply because the party initiating the case has filed a frivolous lawsuit.  As a consequence, we find that a prevailing defendant sued for breach of contract containing an attorney's fees provision and having had to defend the contract cause of action is entitled to

16

recover its own attorney's fees and costs therefor, even though the trial court finds no contract existed."  (*Ibid*.)

Here, Plaintiff alleged in its complaint that Defendants breached the parties' written contracts, and it sought attorney fees "pursuant to contract."  Plaintiff clarified at trial that its claims concerning the Kids' Robes Deal and Auction Deal arose out of contracts in which the parties agreed the deals were to be governed by the same terms as the Dereon Jeans Deal.  The Dereon Jeans Deal contract, in turn, states that "[i]n the unlikely event that legal action is taken by either party against the other, the prevailing party shall recoup from the losing party all legal costs and fees including attorneys' fees."

Given the broad scope of the attorney fees provision and Plaintiff's insistence that the parties incorporated it into the Kids' Robes Deal and Auction Deal contracts, there is no question Plaintiff would have been entitled to its attorney fees had it prevailed on its claims for alleged breaches of those contracts. Because Defendants prevailed instead, they were entitled to their attorney fees under section 1717.  It is irrelevant that the court determined Plaintiff failed to prove the existence of either alleged contract.  (*Hsu, supra*, 9 Cal.4th at p. 870.)

Plaintiff does not dispute that it would have been entitled to attorney fees had it prevailed on its claims as alleged. Nevertheless, it insists Defendants are not entitled to their attorney fees because neither party entered into evidence written contracts related to the Kids' Robes Deal and Auction Deal. Without such evidence, Plaintiff argues, it is not sufficiently clear that it would have been entitled to attorney fees had it prevailed. We are not persuaded.

Contrary to Plaintiff's suggestions, section 1717 does not mandate a copy of the alleged contract be entered into evidence. Indeed, if that were a requirement, a defendant who successfully defeats an action on an oral contract would never be entitled to attorney fees, despite the fact that section 1717 applies to both written and oral contracts. (*Cano v. Glover* (2006) 143 Cal.App.4th 326, 331.) In any event, the record in this case does contain partial copies of the alleged contracts. As noted above, Plaintiff claimed the parties' contracts for the Kids' Robes Deal and Auction Deal incorporated the attorney fees provision of the Dereon Jeans Deal contract, which the court entered into evidence. This is sufficient to show Plaintiff clearly would have been entitled to attorney fees had it prevailed on its claims.

Plaintiff suggests in passing that, because the court might have found Defendants breached oral contracts that lacked attorney fees provisions, it could have prevailed on its claims without being entitled to attorney fees. Plaintiff, however, never urged the court to make such findings, nor did it even acknowledge the possibility that its contracts lacked attorney fees provisions. Instead, it maintained throughout the case that Defendants breached contracts, whether written or oral, with attorney fees provisions. As discussed above, had Plaintiff prevailed on those claims, it clearly would have been entitled to attorney fees. That the court conceivably could have awarded Plaintiff relief under theories it did not pursue does not change that fact.

18

## DISPOSITION

We affirm the judgment and the order awarding attorney fees.  Defendants are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



LIPNER, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.