Filed 2/20/25  Elliott v. Mechanics Bank CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ROBERT T. ELLIOTT,<br><br>   Plaintiff and Appellant,<br><br>   v.<br><br>MECHANICS BANK,<br><br>   Defendant and Respondent. | H051631<br>(Monterey County<br> Super. Ct. No. 21CV003944) |

In this breach of contract action, Robert Elliott sued Mechanics Bank (Mechanics), as successor in interest to Rabobank, N.A. (Rabobank, or "the bank"), after Rabobank repudiated what Elliott believed was a written agreement to resolve a $3,354,371.34 judgment against him.  Elliott alleged that he and Rabobank entered into an agreement in January 2014 that Elliott would pay $140,000 to settle the debt.  Several years passed while Elliott—who understood Rabobank was backlogged with credit files and believed there was no exigency—waited for instructions on paying the settlement amount.  In April 2018, Rabobank responded to an inquiry by Elliott and informed him there was no settlement agreement.  Elliott filed suit in December 2021, alleging breach of the settlement agreement.

Mechanics answered the complaint asserting, among other defenses, that the complaint was time barred.  It later brought a motion for summary judgment.  The trial

court granted summary judgment for Mechanics, finding that Elliott failed to file suit within the applicable four-year statute of limitations and that equitable estoppel did not preclude the bank from relying on its statute of limitations defense. On appeal, Elliott asserts the trial court erred because his breach of contract cause of action accrued only in April 2018, when Rabobank expressly repudiated the agreement. He contends that issues of material fact pertaining to the contract's formation and essential terms, reasonable time for performance, and date of alleged breach preclude summary judgment.

For the reasons explained below, we reject these arguments and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

*A. Facts*[1]

In 2004, Elliott and a group of business associates obtained three loans from Community Bank of Central California (Community Bank) to fund their business enterprise, Premium Fresh Farms, LLC (Premium Fresh). The loans totaled $3,650,000, as follows: (1) United States Small Business Administration (SBA) loan No. 78186840-09, in the sum of $1,900,000, issued on October 12, 2004, guaranteed through the SBA and personally guaranteed by Elliott and each of his business associates; (2) Community Bank loan No. 160064291, in the sum of $1,000,000, not subject to any agency guarantee but personally guaranteed by Elliott and each of his business associates; and (3) Community Bank loan No. 190012401, in the sum of $750,000, guaranteed through the

---

[1] We draw the facts recited here from the record that was before the trial court when it ruled on the motion for summary judgment (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037), including the parties' separate statements of undisputed material facts, evidence judicially noticed in conjunction with the motion for summary judgment, and admissions in the parties' appellate briefs. (See *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 316, fn. 1.) We liberally construe the evidence in support of Elliott, as the party opposing summary judgment, and resolve doubts concerning the evidence in his favor. (*Yanowitz*, at p. 1037.)

2

California Coastal Rural Development Corporation and listed Elliott and his business associates as coborrowers.

Premium Fresh defaulted on the loans in or around 2006. In February 2006, Rabobank became the successor-in-interest by merger to Community Bank and assumed the Premium Fresh loans. In August 2019, Mechanics assumed the loans when it became successor in interest by merger to Rabobank.

In 2007, Rabobank filed suit against Premium Fresh and the individual borrowers and guarantors, including Elliott, in *Rabobank, N.A. v. Premium Fresh Farms, LLC, et al.* (Super. Ct. Monterey County, 2017, No. M82496) based on the loan defaults. In July 2008, Rabobank obtained a joint and several judgment in the amount of $3,354,371.34, against Premium Fresh, Elliott, and his business associates, with interest accruing at 10 percent annually on the judgment per statute (hereafter, 2008 judgment). Rabobank recorded judgment liens against real property owned by the debtors, including Elliott. Several of the debtors filed for bankruptcy, causing the 2008 judgment and liens to be discharged as to those individuals. However, Elliott did not file for bankruptcy.

In mid-2013, Elliott contacted Rabobank about settling the 2008 judgment and liens. Bank representatives referred him to Rabobank's special assets department in Fresno. Elliott spoke with Robert Bennett, Rabobank's senior vice president and director of special assets, and explained his desire to resolve his liability by paying an amount he could reasonably manage instead of filing for bankruptcy. Bennett agreed to meet with Elliott.

Elliott traveled to Fresno to meet with Bennett and present preliminary information about his financial situation, including the judgments against Premium Fresh, property holdings, and financial status of his businesses and liabilities. Bennett asked Elliott to prepare a formal financial statement for Rabobank's review.

On August 8, 2013, Elliott submitted a financial statement to Bennett and returned to Fresno on August 21 to meet with him in person. Elliott brought additional documents

3

to the meeting, including a two-inch thick binder prepared by Elliott's bookkeeper. The binder contained information on Elliott's assets and liabilities, payments and services made by Elliott or his companies in satisfaction of Premium Fresh's debts and to satisfy Premium Fresh's obligations, information on properties Elliott had lost to foreclosure, recent tax filings, profit and loss statements for Elliott's businesses, outstanding loan obligations, and judgments against Premium Fresh. Bennett left the office with materials from the binder, and Elliott understood Bennett was making copies of them. During the meeting, which lasted between 45 minutes and one hour, Bennett explained that Rabobank had a substantial backlog of debtor files from the 2008 market crash. He indicated that he had larger value files to handle and might have to delegate Elliott's file to another agent in the special assets department. Elliott maintains that at no point during their discussions did Bennett inform him that further settlement discussions would require the involvement of any other entity.

In August or September 2013, Bennett referred Elliott to Frank Oliver, Rabobank's then-vice president and senior special assets officer. Elliott traveled to Fresno to meet with Oliver sometime in September 2013. Elliott presented a written proposal of $50,000 to settle the 2008 judgment and liens. Oliver rejected the proposal based on what Elliott understood was the insufficiency of the dollar amount.[2] On

---

[2] The parties present conflicting evidence about what transpired at the in-person meeting and whether Oliver communicated to Elliott that he would need to present additional financial statements, and that any settlement process would be subject to review by the SBA and would require a formal written agreement. According to Elliott, Oliver reviewed the materials he had provided to Bennett, along with the binder that Elliott had again brought, and asked Elliott to submit a formal settlement proposal for Rabobank's consideration. However, Oliver did not mention that any other entity would need to be involved in settlement discussions.

According to Oliver, each time he spoke with Elliott, including during the in-person meeting, he explained that because the 2008 judgment comprised three separate loans, "any resolution process with the SBA, Cal Coastal[,] and [Rabobank] would require that any settlement agreement would be subject to a rather extensive review

September 27, 2013, Elliott sent Oliver an updated financial statement, which Oliver acknowledged in an e-mail that same day. He wrote, "Thank you for the updated personal financial statement. You are welcome to telephone me at 3:30." Although Elliott asserts that Oliver did not ask for any further information or documentation and did not advise about the involvement of any other entity, Oliver states that he informed Elliott that the document "was insufficient for use to initiate [Rabobank]'s review process, or the SBA's Offers-in-Compromise process."[3]

On January 22, 2014, Elliott sent an e-mail to Oliver and Bennett, whom he viewed as " 'head honchos' " in Rabobank's special assets department, attaching a letter proposing settlement of the 2008 judgment and liens. The letter explained Elliott's efforts to settle the judgment against him and his assets to avoid bankruptcy, referenced the financials he had shared with Rabobank, acknowledged his inability to pay off the entire debt and his desire "to leave a better legacy to my family than a judgment on my assets," and offered a settlement payment representing a "compromise to [his] 10% ownership" of Premium Fresh. It proposed that Elliott "will pay $140,000.00 dollars that

process with the SBA, need to be in a formal, written agreement, and that he would be required to provide extensive financial information to support the write-up to the SBA and Bank before any settlement would be reached." Oliver stated that Elliott "was unwilling to accept the requirement that the SBA review process was necessary, and stated he only wanted to 'settle with [Rabobank]' and be released from the [j]udgment." He asserted that Elliott grew agitated with his attempts to explain the strict financial requirements, paperwork, and SBA review process, and when Oliver saw the meeting was not productive, he "brought [it] to a close."

In light of our analysis, *post*, we decide the dispute about whether Rabobank informed Elliott during their discussions that any settlement terms were preliminary and subject to subsequent SBA approval is not material to the resolution of this appeal.

[3] The evidence submitted in support of Mechanics's motion includes declarations summarizing Rabobank's credit policies and procedures for approval of any settlement proposal by the bank's Special Assets Management Credit Committee and the SBA's loan terms and related rules and regulations. These rules include that in the event of a default, any negotiated settlement of an SBA guaranteed loan required approval by the SBA following the submission of specific personal and business financial statements, tax returns, and forms, including the "SBA Offer-in-Compromise" form.

would be $0.70 cents on the dollar" and stated he "would need 18 months to pay the total amount." It proposed four installment payments in alternating increments of $30,000 and $40,000, to be paid on April 1, 2014, September 1, 2014, April 1, 2015, and September 1, 2015. Bennett and Oliver discussed the proposal in an internal e-mail exchange, in the course of which Bennett told Oliver he was "willing to go with the $140K."

On January 23, 2014, Oliver responded affirmatively to Elliott's e-mail. He wrote, "We are willing to accept the $140,000 as payment to release the Rabobank Lien. I would suggest that you begin building a savings account. At this point I have numerous other credit files that have a higher priority. This is going to require some additional review and work with both the SBA and Central Coast SBDC to determine who we will give your payment to. [¶] In the interim I will see if there is another [special assets management [o]fficer that may have the time to work on this." Oliver signed the e-mail with the closing statement "Best Regards," and his signature.

In an e-mail response the next day, which Elliott sent to Oliver and Bennett, as well as to his bookkeeper so she could begin to earmark and set aside the settlement funds, Elliott indicated his eagerness to proceed and thanked Oliver "for your work and acceptance of my Premium Fresh proposal and lean [*sic*] release." Elliott telephoned Oliver "on several occasions" thereafter to request an update and the contact information for his new special assets officer.

In a telephone call on March 25, 2014, Oliver referred Elliott to another Rabobank employee, Kendall Bates, who served at that time as vice president and senior special assets officer. The next day, Elliott sent Oliver an e-mail with the subject line "Settlement" asking for Bates's "contact information in reference to the Premium [s]ettlement." Oliver forwarded the e-mail to Bates, who responded to Elliott by providing his contact information and stating he "may not be able to be of much help" since he "do[es]n't recognize" the reference to the " 'Premium [s]ettlement.' " Elliott sent a subsequent e-mail to Bates on March 28, in which he forwarded Oliver's January

6

23 e-mail stating Rabobank's "willing[ness] to accept the $140,000 as payment to release the Rabobank [l]ien," informed Bates that he had "the first payment in the bank," and stated he "just wanted to confirm the agreement with you for the settlement." Bates replied to Elliott's e-mail by indicat3ing that he wished to "confirm this with" Oliver (who was out of the office that day) before providing Elliott with a response. On April 1, Elliott sent a follow-up e-mail to Bates using the subject line "Settlement." Elliott wrote that he "wanted to confirm the settlement" and "make sure that [he] stay[s] in terms with Rabo[bank]." Elliott indicated that he was set to make his first deposit that day, had the cash ready, and was "wondering if we could confirm the settlement and if [he] should deposit [it] into an escrow account."

Elliott did not receive a response from Bates. He understood, based on statements that Bennett and Oliver had made about Rabobank being overwhelmed with credit files from the 2008 mortgage crash and having higher priority credit files, that Rabobank's special assets department was "overwhelmed with work and lacked the resources to complete the internal processing of the [s]ettlement." Elliott therefore "awaited a directive from Rabobank." He believed the agreement he had reached through his negotiations with Rabobank's special assets department was binding and enforceable. He did not file for bankruptcy but set aside the funds designated for settlement into a designated account.

Elliott had no communication with Rabobank between March 2014 and February 2018, when Elliott telephoned Oliver to inquire about the status of the settlement.[4]  Oliver

---

[4] In November 2015, Rabobank's counsel in the Premium Fresh litigation, Michael Sosnowski, sent each of the judgment debtors under the 2008 judgment, including Elliott, a letter demanding that they pay off the 2008 judgment. Based on his files and recollection, Sosnowski declared that none of the letters he sent was returned to him or marked undeliverable. Sosnowski was not aware of any pending settlement offers or negotiations between Elliott and the special assets department. Elliott declared that he did not recall receiving the boilerplate letter, but even if he did, he "believed [his] [s]ettlement with Rabobank's [s]pecial [a]ssets [d]epartment to be intact."

directed Elliott to another individual, Nicola Merrifield-Olivia, senior vice president and manager in the commercial special assets department, who put Elliott in contact with Adriana Sejera. On March 19, 2018, outside counsel for Rabobank, Matthew Kennedy, contacted Elliott in response to his e-mails to Merrifield-Olivia and Sejera and asked what he would like to discuss. Kennedy attached the most recent filings in the Premium Fresh case, including an application for renewal of judgment and a memorandum of costs, credit, and interest after judgment. On April 6, 2018, Elliott replied to Kennedy. Elliott explained his communications in 2014 with Oliver and Bates about a settlement payment, attached a copy of the "email of the settlement agreement," and asked for instructions on how and when to remit payments to have the 2008 judgment and liens removed.

On April 13, 2018, Kennedy replied to Elliott's e-mail, noted that he had spoken to Oliver and Bates about their communications with Elliott in 2014 and stated Rabobank's position that "no agreement was ever finalized beyond informal discussions/negotiations stage." Kennedy explained that both Oliver and Bates had informed Elliott that any settlement would "have to be reduced to a formal written agreement with the concurrent approval of both the SBA and Central Coast SBDC." He wrote, "Certainly, any reasonable person attempting to negotiate such a significant settlement would expect it to be the subject of a formal written agreement with all the attendant terms and conditions, and such was unquestionably the case here." Kennedy stated that Elliott had never provided the requested financial information that Bates indicated was necessary and suggested that Elliott's subsequent e-mails seeking to " 'confirm the agreement . . . for the settlement' " demonstrated that "no formal agreement had been reached." Kennedy listed the extensive personal financial and business information that Elliott would need to provide "for the [b]ank to consider any negotiations on its judgment" and provided a timeline for Elliott to submit the necessary information and documents so the parties could "commence . . . settlement discussions."

8

Elliott believed, based on Kennedy's response and Rabobank's verified discovery responses in the subsequent litigation, that Rabobank had lost his file and any records of his negotiations with the special assets department and the extensive financial information he had provided. According to Elliott, Kennedy's April 13, 2018 e-mail repudiating the settlement agreement was "the first time any agent of Rabobank suggested the [s]ettlement was not final and binding and that it was subject to new conditions."

*B. Procedural History*

On December 20, 2021, Elliott filed a complaint against Mechanics, as the successor in interest by merger to Rabobank, asserting a single cause of action for breach of contract and declaratory relief. The complaint alleged that on or about "April-October 2018," Mechanics failed to provide Elliott a manner and method of payment and repudiated the agreement, "thus impeding [Elliott]'s performance and unreasonably delaying satisfaction of the" 2008 judgment and liens in breach of the agreement. Elliott sought declaratory relief instructing Mechanics to provide payment instructions and, after receipt of his payment, to file documentation with the court acknowledging full satisfaction of Elliott's obligations and removing all the 2008 judgment related liens and encumbrances.

Mechanics generally denied the complaint allegations and asserted affirmative defenses, alleging Elliott's breach of contract cause of action was barred by the statute of frauds and statute of limitations. In July 2022, Elliott moved unsuccessfully for summary judgment on his breach of contract claim. In its order denying the motion, the trial court found that Elliott failed to meet his burden of establishing an enforceable contract via an unequivocal acceptance by the bank, and even if he had met his burden on summary judgment, that Mechanics had shown the existence of a triable issue of material fact.

In April 2023, Mechanics filed a motion for summary judgment (motion). The motion asserted that the undisputed material facts do not support, as a matter of law, the

existence of a valid, enforceable agreement to settle the 2008 judgment, and in any event, Elliott's claim is barred by the statute of limitations. Elliott opposed the motion, arguing that his e-mails with the bank established a valid contract with all essential terms understood and agreed upon. Elliott challenged Mechanics's reliance on parol evidence to show the bank had communicated the need for further negotiation of terms, the approval of the SBA, and for a formal, signed writing. He further maintained that the evidence satisfied the statute of frauds and demonstrated that his complaint was timely, or, at a minimum, that there was a triable issue of fact as to whether Elliott had reasonably identified breach of the agreement only upon the bank's express repudiation.

Both sides submitted their respective separate statements of undisputed material facts (separate statement) and evidence in support of and opposition to the motion. Mechanics proffered the declarations of their counsel, Matthew Kennedy, and those of Oliver, Bates, Sosnowski, and Mechanics's senior vice president of retail special assets management department, Kyle Cook, as well as copies of the e-mails between Elliott and Rabobank and deposition excerpts. In support of his opposition, Elliott filed his declaration and that of his counsel, as well as Mechanics's discovery responses and certain deposition excerpts illustrating Sosnowski's lack of knowledge about the settlement discussions between Rabobank and Elliott and Rabobank's apparently missing file of any documents or financial information concerning Elliott's settlement. Mechanics filed detailed objections to Elliott's evidence, including to considerable portions of his declaration in support his opposition to the motion.

In its tentative ruling on the motion, the trial court identified the statute of limitations as the controlling issue and requested additional briefing on its application to the facts based on the timing of the breach of the alleged contract. The court asked the parties to address the issue of accrual of the cause of action for breach of contract under Civil Code section 1657, which provides that "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." The court

also asked the parties to brief the issue of estoppel and whether Mechanics should be estopped from relying upon the defense of statute of limitations. Both sides submitted supplemental briefs and addressed the statute of limitations issue at the hearing. The court indicated at the hearing that while it believed there were triable issues as to the existence of a contract and the statute of frauds, it found the four-year statute of limitations provided a "complete defense to the action."

In a written order, the trial court granted the motion for summary judgment. It explained that while a reasonable time for performance under Civil Code section 1657 is typically a question for the trier of fact, a court can decide, as a matter of law, "the limits of a reasonable time based on [] undisputed material facts." After considering the parties' arguments concerning reasonable time for performance and accrual of Elliott's breach of contract cause of action under the circumstances, the court determined, based on specified undisputed material facts in the record, that "reasonable minds can only arrive at one conclusion that [Mechanics]'s time for performance and breach accrued at a time in excess of the four-year statute of limitations, even while calculated with a tolling from the Judicial Council's California Rules of Court, emergency rule 9, adopted during the Covid-19 pandemic." The court further concluded that equitable estoppel did not apply because there were no acts by Mechanics that induced Elliott to forego suing. The court also ruled on those objections it deemed material to the motion.

On October 24, 2023, the trial court entered judgment in favor of Mechanics and awarded its costs of suit. This appeal followed.

## II.  DISCUSSION

Elliott challenges the judgment on two primary grounds.[5] He contends the trial court erred in granting summary judgment on his breach of contract claim because the

---

[5] Although Elliott also asserts that the writings comprising the settlement agreement satisfy the statute of frauds, he does not develop his argument, which we need not reach in light of our discussion, *post*.

11

undisputed evidence establishes that he and Rabobank entered into an agreement to resolve the 2008 judgment and liens, or, at a minimum, gives rise to triable issues concerning the formation of a valid contract. Elliott next contends the court misconstrued the evidence related to determining accrual of his breach of contract claim, overlooked the competing inferences that may be drawn from the evidence (and must be decided by the trier of fact), and erroneously concluded it could decide the statute of limitations defense as a matter of law.

Mechanics counters that the trial court correctly ascertained accrual of the cause of action based on Elliott's actual knowledge of the bank's alleged nonperformance under the agreement almost six years before he filed suit. Mechanics maintains that, even considering a reasonable time for performance of the purported contract under Civil Code section 1657, Elliott's breach of contract claim began to accrue more than four years before he filed suit. Mechanics further contends that, if not barred by the statute of limitations, the undisputed evidence establishes there was no mutual consent to form a contract. Mechanics also renews its evidentiary objections (those which the trial court did not consider in its summary judgment ruling) to statements in Elliott's declaration in opposition to the motion.

### A. Legal Principles and Standard of Review

Whether the trial court erred in granting a defendant's motion for summary judgment is a question of law we review de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.) Summary judgment is warranted where there are no triable issues of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) When reviewing an appeal after a motion for summary judgment has been granted, "we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to 'decide whether the

12

opposing party has demonstrated the existence of a triable, material fact issue.' " (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630).)

Mechanics, as the party moving for summary judgment, bears the burden of persuasion "from commencement to conclusion" of the motion that there is no triable issue of material fact and that it is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) To meet its persuasive burden, the party requesting summary judgment has an initial burden of demonstrating that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar*, at p. 850.) If the moving party makes a prima facie showing that justifies judgment in its favor, the burden shifts to the opposing party to make a prima facie showing of the existence of a triable issue of material fact as to the cause of action. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 849.)

In determining whether the parties have met their respective burdens, we " 'consider[] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035.) "The evidence in favor of the party opposing the motion must be liberally construed, and all doubts concerning the evidence must be resolved in favor of that party." (*Eloquence Corp. v. Home Consignment Center* (2020) 49 Cal.App.5th 655, 660.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) "A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

13

### B. Statute of Limitations

We begin with the statute of limitations defense, which Mechanics contends, and the trial court found, provides a complete defense to Elliott's breach of contract action.

As a rule, "[a] plaintiff must bring a claim within the limitations period after accrual of the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).)  A cause of action typically "accrues at 'the time when the cause of action is complete with all of its elements.' " (*Ibid.*)  Put differently, "a cause of action accrues at the moment when the party alleging injury is entitled to ' " 'begin and prosecute an action thereon.' " ' " (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 930–931 (*Pollock*).)  However, certain equitable exceptions "may alter the rules governing either the initial accrual of a claim, the subsequent running of the limitations period, or both." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192.)  "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 (*Jolly*); *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 (*Romano*).)

The parties agree that the applicable statute of limitations in this case is four years. (Code Civ. Proc., § 337, subd. (a); *Bennett v. Ohio National Life Assurance Corp.* (2023) 92 Cal.App.5th 723, 728 (*Bennett*) ["A breach of contract claim is subject to a four-year statute of limitations."].)  The determinative and disputed question on appeal is at what point did Elliott's breach of contract claim accrue, triggering the commencement of the four-year statute of limitations.

"A cause of action for breach of contract does not accrue before the time of breach." (*Romano*, *supra*, 14 Cal.4th at p. 488; see *Bennett*, *supra*, 92 Cal.App.5th at p. 729 [noting the elements of a cause for breach of contract are " '(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's

14

breach; and (4) damages to plaintiff as a result of the breach.' "].)  Breach may occur
" 'by nonperformance, by repudiation, or a combination of the two.' " (*Hewlett-Packard
Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 550.)  Breach by nonperformance
"ordinarily occurs upon the promisor's failure to render the promised performance."
(*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 958
(*McCaskey*), italics omitted.)  Under this formulation, " '[t]here can be no *actual* breach
of a contract until the time specified therein for performance has arrived.' "  (*Romano*, at
p. 488.)  To "pinpoint the time of an alleged breach" by nonperformance for purposes of
the statute of limitations, the court must therefore ascertain "what it was the defendant
promised to do, or refrain from doing, and *when its conduct diverged* from that promise."
(*McCaskey*, at p. 958.)  By contrast, breach by express repudiation (as Elliott contends
occurred here) is signaled by " 'a clear, positive, unequivocal refusal to perform.' "
(*Hewlett-Packard*, at p. 550.)

Elliott argues that Rabobank's conduct first diverged from its promise to settle the
judgment against him only when it expressly repudiated the alleged settlement on April
13, 2018.  He maintains that Rabobank's conduct before April 2018 did not give any
indication of breach because there was no time for performance specified in the
agreement, time was not "of the essence," and the parties' circumstances when they
entered the agreement—including Rabobank's large backlog of commercial credit files—
implied a reasonable time of six years for its performance.  Thus, he asserts his breach of
contract claim accrued on April 13, 2018.

Mechanics counters that accrual occurred no later than September 1, 2015—the
date by which Elliott would have completed his fourth and final installment payment
under the terms he proposed when he and Rabobank entered into the alleged agreement.
Mechanics contends that, by that time, Elliott knew or should have known that Rabobank
was not performing its promise to allow Elliott to make his settlement payments.
Mechanics submits that even under Civil Code section 1657's "reasonable time"

15

standard, which applies when the contracts fail to specify a time for performance, the law implies diligence and good faith in the performance of the contract. Mechanics asserts that allowing up to four years for Rabobank to respond and instruct Elliott on payment of the purported settlement is not reasonable within the meaning of the law.

Whether Elliott's action is barred by the statute of limitations hinges on whether the accrual timing is based on alleged breach by repudiation (Rabobank's e-mail of April 13, 2018) or alleged breach by nonperformance (based either on Elliott's terms of proposed payment, or on a reasonable time to perform under Civil Code section 1657), and whether breach by nonperformance can be decided on these facts as a matter of law. Because the statute of limitations is an affirmative defense, Mechanics bears the burden to prove all facts essential to each element of the defense. (*Pollock*, *supra*, 11 Cal.5th at p. 945.) On summary judgment, Mechanics bears the initial burden to establish, as a matter of law, that Elliott's cause of action accrued no later than December 19, 2017, that is, four years before the date Elliott filed suit on December 20, 2021. (*Bennett*, *supra*, 92 Cal.App.5th at p. 728.) Upon making a prima facie showing, the burden shifts to Elliott to establish the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subds. (*o*), (p)(2).)

Mechanics cites Elliott's proposed payment schedule in the January 22, 2014 e-mail to Rabobank as evidence of the timeline for performance of the alleged agreement. Elliott's proposed settlement terms identified four installment payments (totaling $140,000) between April 1, 2014, and September 1, 2015. Mechanics points to undisputed evidence that Elliott did not provide any payment to Rabobank on that, or any other schedule, nor did Rabobank instruct Elliott to proceed with payments under the agreement on any of those dates. Mechanics asserts that the bank's failure to respond to Elliott's March 28 and April 1, 2014 e-mails seeking confirmation of the settlement and instructions on how and where to make his first payment gave the first indications of nonperformance and should have caused Elliott to suspect something was amiss with the

agreement.  Mechanics additionally points to the November 9, 2015 letter from Rabobank's counsel, Sosnowski, demanding payment on the 2008 judgment, as additional evidence putting Elliott on notice that the bank did not subscribe to his purported settlement agreement.[6]  Elliott counters that he was "reasonably awaiting Rabobank's pending performance" when he was notified of its repudiation on April 13, 2018.

While a cause of action typically "accrues at 'the time when the cause of action is complete with all of its elements' " (*Fox*, *supra*, 35 Cal.4th at p. 806), an exception to that general rule—referred to as the " 'discovery rule' "—"postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Ibid*.)  Under the discovery rule, "[a] plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements."  (*Id*. at p. 807.)  A plaintiff has reason to suspect when he has " ' " ' "notice or information of circumstances to put a reasonable person *on inquiry*" ' " ' " (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398), such that "within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place — he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does."  (*Ibid*.; see *Fox*, at p. 807.)

Elliott's complaint alleged that the bank breached the agreement on or about "April-October 2018" by "[f]ailing and continuing to fail to provide [him] a manner and method of payment" and by "denying the agreement, thus impeding [his] performance and unreasonably delaying satisfaction of the [2008 judgment] and related [] liens." Although Elliott asserts that Rabobank's first indication of nonperformance was its

---

[6] Although Elliott denied receiving Sosnowski's letter, Mechanics points to evidence showing the letter was sent to the correct address, was not returned to the sender, and each of the other judgment debtors received their letters demanding payment of the 2008 judgment.

repudiation, the undisputed evidence demonstrates that Rabobank's failure to respond to Elliott about the "manner and method of payment" placed Elliott on "inquiry notice" of the cause of action much earlier. As of the first proposed payment due date of April 1, 2014, and certainly by the last proposed installment date of September 1, 2015, Rabobank's failure to perform gave Elliott " 'reason at least to suspect a factual basis for' " (*Fox*, *supra*, 35 Cal.4th at p. 807) the elements of his breach of contract claim. Such "reason to discover a cause of action" (*ibid.*) satisfies the standard to trigger the limitations period under California Supreme Court cases like *Fox*, *Jolly*, and *Norgart*.

Elliott's behavior in waiting almost four years to contact Rabobank after failing to secure confirmation of the settlement or instructions on payment and nearly another four years before filing suit cannot be considered reasonable diligence in pursing his purported claim. (See *Jolly*, *supra*, 44 Cal.3d at p. 1112 [noting policies underlying statute of limitations aim "to protect parties from defending stale claims" and "to require plaintiffs to diligently pursue their claims"].) We therefore conclude that Mechanics has made a prima facie showing that Elliott's breach of contract action accrued as of September 1, 2015, when Rabobank's inaction on any payment plan for the purported settlement agreement reasonably should have put Elliott on inquiry notice of the bank's nonperformance.

We turn to Elliott's burden to establish the existence of a triable issue of material fact with respect to this accrual date. Elliott contends the above cases applying the discovery rule are distinguishable because they involved facts in which only one reasonable inference could be drawn concerning the plaintiff's forewarning of breach, whereas the facts of this case support competing inferences as to a reasonable timeline for performance of the settlement agreement. (See, e.g., *Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 502 ["When the answer to a question of law depends on the underlying facts and the record can support competing inferences . . ., summary adjudication should be denied and the ultimate decision on the legal issue deferred."].)

18

Specifically, Elliott asserts the trial court may draw a competing inference as to the proposed payment/performance schedule because it is undisputed that Rabobank disregarded his proposed payment calendar when it accepted the $140,000 settlement offer. Instead, Rabobank indicated "[t]his is going to require some additional review and work with both the SBA and Central Coast SBDC to determine" who would receive the payments. Elliott cites his communications with Bennett and Oliver preceding the alleged agreement as further evidence that Rabobank did not agree to any specific timeline for performing on the agreement because it had a backlog of credit files dating back to the 2008 economic crisis. According to Elliott, these undisputed facts lead to the competing inference that the disregarded payment schedule was not a term of the settlement agreement and, thus, Civil Code section 1657 applies.

We do not agree that the record unambiguously shows Rabobank rejected the proposed payment schedule. Rabobank's reference to "higher priority" credit files and "additional review and work with both the SBA and Central Coast SBDC" to ascertain the plan for payment suggests that it viewed the proposed payment schedule as subject to additional verification with the other entities and alerted Elliott that the process might take longer than he anticipated.[7] We nevertheless agree with Elliott that Rabobank's reference to additional work needed, together with the evidence that its agents were too busy to attend immediately to the file, supports an inference that insofar as Rabobank did not definitively adopt the proposed payment schedule, it left unspecified the time and manner of payment. Because the law implies a reasonable time for performance where it is not specified in the agreement (Civ. Code, § 1657), we consider what constituted a

---

[7] In a subsequent e-mail on April 1, 2014, Elliott wrote to Bates seeking to confirm the settlement and "if [he] should deposit it into an escrow account." Elliott continued to reference his proposed payment calendar in this e-mail, casting doubt on his later assertion that the proposed installment schedule was indisputably "discarded" and "has no relevance to the accrual analysis." (Boldface omitted.)

"reasonable time" under the circumstances and whether that period may be decided as a matter of law under the circumstances of this case.

Civil Code section 1657 states in relevant part, "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed." In general, what constitutes a reasonable time under the law presents a question of fact and depends on the circumstances of each case. (*Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950, 956 (*Kotler*); *Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 381 (*Consolidated World*); see *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 30 [defining " 'a reasonable time' " as " 'a question of fact, depending upon the situation of the parties, the nature of the transaction, and the facts of the particular case.' "].) As Elliott acknowledges, however, the limits of reasonable time may be decided as a matter of law when only one legitimate inference may be drawn from the undisputed facts. (See *Romano*, *supra*, 14 Cal.4th at p. 487.)

We decide that, under the circumstances of this case, the outer bounds of "reasonable time" may be decided as a matter of law. While Rabobank's performance of its "review and work . . . to determine" the recipient of Elliott's payment might have tarried beyond Elliott's proposed schedule based on the credit file backlog and need to confer with SBA and Central Coast SBDC, Rabobank would have been expected to commence these steps within a reasonable period of time. Elliott's proposed timeline of "six years or more" (boldface omitted) for Rabobank to begin the process that would allow performance of the agreement does not conform to this standard.

The phrase "reasonable time [] allowed" (Civ. Code, § 1657) is not an abstract concept but one that must be construed in context of "the performance of an act required to be performed" under the subject agreement. (*Ibid.*) For example, in *Consolidated World*, the appellate court upheld a grant of nonsuit as to the plaintiff's breach of contract claim arising from the plaintiff's failed attempt to purchase an apartment building from

20

the defendant after the plaintiff failed to request the opening of escrow within the time contemplated by the agreement. (*Consolidated World*, *supra*, 9 Cal.App.4th at pp. 377–378, 380.) The agreement provided that escrow would close 60 days from the date of the agreement but did not specify a time limit for the plaintiff's request to open escrow. (*Id.* at p. 377.) The appellate court rejected the plaintiff's claim that a " 'reasonable time' for performance" under Civil Code section 1657 had not yet expired 72 days after the date of the agreement. (*Consolidated World*, at p. 381.) The court explained that although there was no *specific* time mentioned in the contract for the request to open escrow, "the escrow period is defined as '60 days from the date of this Agreement.' Thus, a *reasonable* time for requesting opening of escrow has to be a time which in the normal course of events would permit escrow to close within 60 days from the date of the agreement. Logic compels the conclusion that under the terms of the contract a 'reasonable time' to *open* escrow could not be a time which falls beyond the period to *close* escrow." (*Id.* at p. 382.) The court concluded that the plaintiff, as a matter of law, did not perform its duty to request opening of escrow within a reasonable time. (*Ibid.*)

By contrast, in *Kotler*, the appellate court reversed a grant of summary judgment in favor of the defendant health plan after finding there was a triable issue of fact whether the defendant breached its subscriber agreement with the plaintiff by unreasonably delaying authorization to refer the plaintiff to a specialist based on his symptoms. (*Kotler*, *supra*, 126 Cal.App.4th at p. 956.) The court rejected the need for the plaintiff to establish that the delay in his referral for specialist care violated a medical or community standard, noting that "the standard of reasonableness applicable in this case is a conventional one, derived from 'the situation of the parties, the nature of the transaction, and the facts of the particular case' [citation], and its establishment does not require further proof." (*Ibid.*) The court reasoned that "[g]iven the history of [the] plaintiff's illness, his condition, and the palliative failure of the care already provided under [the

21

defendant]'s aegis, a six-week wait for an appointment following [the given] referral could well be found unreasonable." (*Ibid*.)

These cases illustrate that although the "reasonable time [] allowed" (Civ. Code, § 1657) is a factual question, it may be decided as a matter of law when the relevant evidence fails to support construing the time for performance beyond a point that could be deemed reasonable based on the nature of the transaction and situation of the parties. As in *Consolidated World*, the nature of the agreement here required one party (Rabobank) to take specific steps required for the fulfillment of subsequent obligations under the agreement. The 18-month proposed payment schedule reflects what Elliott contemplated was a reasonable period to fulfill his obligation on the debt. As stated in Oliver's January 23, 2014 e-mail, Rabobank was "willing to accept" the proposed settlement amount of $140,000 but noted it was "going to require some additional review and work" and that because Oliver had "numerous other" higher priority credit files, he would check if another agent could work with Elliott. Although the actions identified by Rabobank as necessary to enable settlement did not specifically reference the proposed payment window of 18 months (April 1, 2014–September 1, 2015), a *reasonable* time for conducting the necessary review would track that proposed schedule as closely as possible to enable the agreed-upon payments. (See *Consolidated World*, *supra*, 9 Cal.App.4th at p. 382 [ascertaining "*reasonable* time for requesting opening of escrow" in terms of the time which in the normal course of events would permit escrow to close within the agreed-upon period].)

That Rabobank did not definitively adopt or act on Elliott's proposed timeline for payment does not render that reference point irrelevant or support an inference that Rabobank's performance was open-ended or could continue indefinitely. Nor are we persuaded that evidence of Rabobank's backlog, illustrated by Oliver's and Bennett's prior communications with Elliott suggesting they were inundated with credit files and unable to themselves work on Elliott's proposed settlement of the 2008 judgment,

22

supports an inference of "a reasonable time of six years or more" (boldface omitted) for Rabobank's performance. On the contrary, we conclude the undisputed evidence does not support an inference that would extend Rabobank's reasonable time for performance from 18 months to *four years* (measured from the time of the parties' agreement in January 2014).

We conclude that, to the extent Rabobank promised to provide Elliott with the means to settle the 2008 judgment by determining which entity would receive the payment and arranging for an agent to work with him on that process, a reasonable time to do so would have tracked the proposed 18-month payment schedule as closely as possible, extending only as needed to accommodate obtaining the required information from the SBA and Central Coast SBDC. Rabobank's conduct indisputably "*diverged* from that promise" (*McCaskey*, *supra*, 189 Cal.App.4th at p. 958) as early as April 2014 by failing to respond to Elliott's follow-up inquiries or take any steps toward performing the additional "review and work" cited in the alleged agreement. We therefore decide the trial court did not err in deeming accrual of the cause of action, as a matter of law, to have occurred before December 20, 2017, and outside the statute of limitations period.[8]

### C. *Equitable Estoppel*

Elliott asserts that equitable estoppel bars Mechanics's statute of limitations defense and presents a question of fact, precluding the grant of summary judgment on statute of limitations grounds. He contends that he "reasonably relied on the outward

---

[8] Having determined Elliott's breach of contract cause of action is barred by the statute of limitations, we need not address Elliott's arguments on appeal concerning the validity of the alleged settlement agreement, the admissibility of parol evidence to assist in interpreting the agreement, and the existence of a triable issue of fact concerning the agreement's formation and essential terms. We similarly need not address Elliott's asserted argument concerning the statute of frauds. We also decline to address Mechanics's outstanding evidentiary objections to Elliott's declaration in opposition to the motion as immaterial to our analysis, which is based on undisputed evidence comprising e-mail correspondence between the parties.

expressions and conduct of [Mechanics] in concluding that the bank's performance could involve six years or longer," though he does not develop the argument or offer more than a conclusory reference to supporting legal authority. This unsupported assertion is insufficient to demonstrate error on appeal or establish a triable issue of material fact. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."].)

Moreover, our independent review of the trial court's determination on summary judgment (*Samara*, *supra*, 5 Cal.5th at p. 338) confirms that the record does not support the application of equitable estoppel, which requires evidence of conduct that induces the plaintiff to delay or refrain from filing suit during the statutory period. (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383 (*Lantzy*) [noting equitable estoppel applies to prevent a party " ' "from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period" ' "].)

Our high court has explained that evidence of intentional fraud or deliberate misrepresentation by the party sought to be estopped (see Evid. Code, § 623) is not necessary. (*Lantzy*, *supra*, 31 Cal.4th 363 at p. 384.) " ' "To create an equitable estoppel, 'it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss.' . . . ' . . . Where the delay in commencing action is induced by the conduct of the defendant it cannot be availed of by him as a defense.' " ' " (*Ibid.*; *Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1152–1153.) The plaintiff asserting equitable estoppel must be able to demonstrate that his reliance was reasonable. (*Vu*, at pp. 1152–1153.) Also, the conduct underlying the estoppel "must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the

defendant's mere denial of *legal liability* does not set up an estoppel." (*Lantzy*, at p. 384, fn. 18, citing *Vu*, at pp. 1149–1153.)

Elliott asserts that he reasonably relied on Mechanics's "outward expressions and conduct" in believing there was mutual assent to the settlement agreement. However, even assuming arguendo that the evidence established a reasonable basis for Elliott to believe he had secured a valid settlement agreement in January 2014, Elliott has cited no evidence to support an argument that Mechanics engaged in conduct bearing on the necessity of filing suit and which induced him to refrain—for four years—from acting on Mechanics's apparent nonperformance of the steps identified in the purported agreement. The undisputed evidence is to the contrary and shows that Elliott's attempts in March and April 2014 to "confirm" the settlement and payment plan went unanswered. It would be unreasonable to construe Mechanics's open and obvious failure to confirm the existence of a settlement agreement or take any action toward performing under that agreement for the next four years as having induced Elliott to reasonably rely upon the settlement agreement for several years thereafter without further investigation.

We conclude that the trial court did not err in rejecting the application of equitable estoppel to Mechanics's statute of limitations defense.

### III. DISPOSITION

The judgment is affirmed. Respondent is entitled to its reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

25

_____
                                    Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Bromberg, J.

**H051631**
*Elliott v. Mechanics Bank*